[No. 67340-3.   En Banc.]
Argued January 27, 2000.     Decided May 4, 2000.
ALUMINUM COMPANY OF AMERICA, ET AL., *Appellants*, v. AETNA CASUALTY & SURETY COMPANY, ET AL., *Respondents*.

*Heller Ehrman White & McAuliffe*, by *Leonard J. Feldman*, for appellants.

*Peery, Hiscock, Pierson, Kingman & Peabody*, by *Dale Lawrence Kingman*; and *T. Arlen Rumsey*, for respondents.

*John James Leary, Jr.* and *Terrence Lee Fredrickson*, on behalf of Current London First Party Insurer, amicus curiae.

TALMADGE, J. — We are asked in this case to apply the law of Pennsylvania to resolve disputes between the Aluminum Company of America, its subsidiary Northwest Alloys, Inc. (Alcoa), and 167 insurers regarding insurance coverage for

environmental damage under comprehensive general liability (CGL) policies and property insurance policies called differences in conditions (DIC) policies. We accepted direct interlocutory review in this case. RAP 2.2(d); RAP 4.4. We generally affirm the trial court's disposition of the issues in the case, but we reverse the trial court with respect to its treatment of the issues of fortuity, the contractual limitation periods, and the allocation of damages.

## FACTS[1]

Alcoa is a large multinational aluminum producing company with industrial locations across the United States and the world. In the ordinary course of its business over the years, Alcoa generated waste products that were stored in on-site disposal facilities, landfills, and lagoons; and sometimes discharged into the property of others. In recent years, federal and state environmental agencies and private parties made claims against Alcoa for the cleanup of groundwater, surface water, and soil contamination at disposal sites, lagoons, landfills, and other such facilities in Washington and around the country, all stemming from Alcoa's disposal of its waste products. Alcoa paid for investigation and remediation of the environmental harm. Alcoa's claims for coverage in this case involved 35 different facilities in 11 different states. Raising a variety of defenses, the insurers denied coverage. Alcoa thereafter filed this declaratory judgment action in the King County Superior Court in December 1992 against 167 insurers seeking coverage for

---

[1]The record in this case was vast, covering some 57,000 pages of Clerk's Papers and a Report of Proceedings of over 12,000 pages. The parties agreed to bear the cost of scanning the record into an electronic format. The parties also submitted their briefs in CD-ROM form with hyperlinks to the record and the cases cited. We express sincere appreciation to the parties for doing this, as it greatly enhanced our ability to handle this case. The savings to the Court in time-motion efforts alone enabled us to retrieve and examine relevant parts of the record with ease, and made the record far more accessible than it would have otherwise been. The materials in this case occupy about 50 banker's boxes.

We note that there is no reason why parties in more routine appeals to this Court should not seriously consider submitting the record and briefs to us in a similar format.

the cost of pollution damage, investigation, and remediation.

The present case was assigned to the Honorable J. Kathleen Learned who was faced with the daunting task of addressing discovery in this large, complex matter, handling numerous dispositive pretrial motions, and ultimately conducting the trial of the issues. Judge Learned did an admirable job of managing this extraordinarily complex case.

The trial court determined the law of Pennsylvania applied, largely because Alcoa's headquarters are located in Pittsburgh.[2] Ultimately, the trial court granted summary judgment motions determining Alcoa had an insurable interest as to groundwater under its property, Alcoa did not have coverage for certain DIC policy claims because the losses were not fortuitous, and Alcoa had no coverage under the CGL policies because the pollution exclusion barred coverage.

In order to streamline pretrial and trial procedure, the trial court designated 3 of the 35 sites at issue—Vancouver, Washington; Massena, New York; and Point Comfort, Texas—as test sites for the trial. Original damage estimates against the DIC insurers for these three sites alone approached $850 million. The trial court, in designating these three sites for trial,

> hoped that the parties could focus their discovery on the test sites, develop their respective legal theories, file appropriate dispositive motions, and receive a definitive resolution regarding all of the disputed factual and legal issues surrounding the test sites and that such resolution would provide a basis for settlement, rather than trial, of the remaining first-party [DIC] sites.

Clerk's Papers at 050753.[3]

The trial involving the three sites was called Phase I; the

---

[2]On appeal, no party disputes the trial court's Order on Choice of Law applying Pennsylvania law to resolve the issues before us.

[3]As the trial court noted, during the pretrial period, "the parties took over 500 depositions, produced millions of pages of documents, and submitted over a

future Phase II trial is intended to resolve issues arising from the remaining 32 sites. The Phase I trial consisted of two stages. Stage 1 was designed to determine whether the policy jackets the DIC insurers added to the insurance policy Alcoa drafted were part of the insurance contract. That trial lasted three weeks. The jury returned a complete verdict concerning the applicability of policy jackets to the insurance contract. The Stage 2 trial lasted 10 weeks and the jury deliberated for three months before returning an incomplete verdict; the jury answered only about one-half of the interrogatories submitted to it.

The trial court then certified the case for appeal pursuant to CR 54(b), setting out in detail all of the jury's findings of fact and the trial court's extensive summary judgment orders containing conclusions of law. The trial court certified the case for reasons of judicial economy, concluding, "there must be resolution of the legal standards that will apply" before continuing with trial on the remaining 32 sites. Clerk's Papers at 050755. RAP 2.2(d). Pursuant to RAP 4.4, the Court of Appeals, Division One, transferred the case to us, and we accepted direct review.

## ISSUES

1. Did Alcoa have an insurable interest in the groundwater?

2. Did Alcoa's alleged misrepresentations or failure to disclose relevant information to its insurers render the policies void ab initio?

3. Did the trial court correctly grant summary judgment to the insurers on coverage under the CGL policies' pollution exclusion provisions?

4. Did the DIC policies' suit limitation provisions apply?

5. Did the trial court correctly apply the known risk or fortuity defense to the DIC policies?

hundred motions to the Court, at least thirty of which involved dispositive issues." Clerk's Papers at 050753.

6.   Under the terms of the DIC policies, should the damages be prorated among the years of damage if the environmental harm was indivisible?

## ANALYSIS

We begin with the contract formation issues; we then proceed to the coverage questions; we conclude with the issues pertaining to damages.

## A. Background to the Insurance Coverages

To understand the issues in this case fully, it is necessary to describe how the parties agreed to the insurance coverage provided and the nature of the coverage obtained. As befits a large, sophisticated, multinational enterprise, Alcoa had its own internal insurance or risk management department. Wishing to procure property insurance for its far-flung operations for the periods 1977-80, 1980-83, and 1983-84, Alcoa prepared "submissions" that described the nature of Alcoa's business, its properties, and the insurance coverages Alcoa sought. Attached to the submissions were "manuscript forms," actual proposed insurance policies prepared by Alcoa and its insurance brokers. The manuscript forms included both CGL and DIC coverages. Large insurance brokerage firms shopped the submissions and manuscript forms to various insurers. The insurers responded with price quotations for the layers of coverage they offered to Alcoa. Upon the placement of coverage, the insurers sent "policy jackets," standard policy language, to the brokers for inclusion in the formal policies.

Ultimately, the first layer of CGL coverage for the period 1977-84 was placed with Commercial Union. Lexington covered the first layer of DIC coverage for 1977-80, but various other insurers provided the initial coverage for 1980-84. Numerous insurers provided excess layers of coverage.

In the mid-1980s, pressed by state and federal regulators to clean up environmental hazards on its own property and

elsewhere, Alcoa incurred substantial expenses to remediate these hazards. The essence of the problem with Alcoa's insurance coverage claims here rested with the retroactive liability imposed on potentially responsible parties by CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980), 42 U.S.C. § 9607(a)(2). *See, e.g., Combined Properties/Greenbriar Ltd. Partnership v. Morrow*, 58 F. Supp. 2d 675 (E.D. Va. 1999) (retroactive application of CERCLA does not violate due process). At the time the coverages were placed in this case, it is unlikely any of the parties anticipated CERCLA's imposition of retroactive liability on Alcoa. To compound the complexity of the issues here, a significant portion of the harm was to Alcoa's own property.

Central to understanding the insurers' defenses is recognition of the two different types of insurance involved in this case: CGL insurance (third-party insurance), and a special type of property coverage known as DIC insurance (first-party insurance). Some of the insurers issued both types of policies to Alcoa.

"Third party insurance involves protection for the policyholder for liability it incurs to someone else, while first party insurance involves protection for losses to the policyholder's own property." *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wn.2d 464, 479, 918 P.2d 923 (1996). Generally, a CGL policy insures against injury or damage to a third party; the insurer agrees to defend and indemnify the insured against liability for risks identified in the policy. A DIC policy, by contrast, is generally a first-party insurance policy that indemnifies the insured for damage to its own property. Harold Meeks, a former manager of Alcoa's casualty and property insurance division, testified Alcoa purchased DIC insurance to cover damage to Alcoa's property not covered by other property damage policies Alcoa had in place. In particular, the DIC

policies were "all-risk" policies[4] that acted either as excess coverage to risks covered by other Alcoa property damage policies, or primary coverage for property damage not covered by Alcoa property damage policies. Trial Ex. 431 at 6 ("perils insured"), 10 ("other insurance").[5] According to the trial court, DIC policies were written for only a short period of time (the late 1970s to the early 1980s), so there is either no authority or only sparse authority for their interpretation. Clerk's Papers at 050753.[6]

The trial court granted summary judgment dismissing Alcoa's claims against the CGL insurers on the basis of the pollution exclusion clause for 33 of the 35 sites at issue. The interpretation of the pollution exclusion clause is the single issue on appeal arising from the CGL policies. The DIC policies presented many issues that were not, like the CGL policies, susceptible to summary judgment. Consequently, the case was tried in the King County Superior Court on issues relating to the DIC coverage.

## B. Insurable Interest in Groundwater

The first issue we address goes to the formation of the DIC insurance contracts. The trial court held, without dispute on appeal, "The Court determines that the 1977-80 and 1980-83 Difference in Conditions ('DIC') policies insure

---

[4]Although the insurers have described the DIC policies as "all-risk" property insurance policies, the scope of the risk underwritten by such policies bears little resemblance to the marketing label placed on them. In fact, these policies exclude numerous risks. The DIC policies Alcoa negotiated contained a page-and-a-half listing of specific exclusions. Trial Ex. 590, at 3-5. We have previously cautioned against misleading insurance marketing descriptions of policies. *See Olds-Olympic*, 129 Wn.2d at 471 ("Insureds are not purchasing 'almost comprehensive' coverage. CGL policies are marketed by insurers as comprehensive in their scope").

While we doubt as sophisticated an insurance purchaser as Alcoa was misled by the policy labels here, in the appropriate case, we may hold insurers to the coverage described by their marketers, as opposed to the coverage provided by their underwriters.

[5]*See* Case Management Order 2. Clerk's Papers at 000111-13. Exhibit A to Alcoa's Second Amended Complaint lists the 99 CGL insurers it sued, and Exhibit B lists the 68 DIC insurers it sued. Clerk's Papers at 000138-46.

[6]The indices to the standard insurance treatises, COUCH and APPLEMAN, contain no references to DIC policies.

only property in which plaintiffs [Alcoa] had an insurable interest as of the date of loss or damage." Clerk's Papers at 041154 (footnote omitted). The DIC policies contained the following definition of "property insured":

> PROPERTY INSURED: The interest of the Insured in all Real and Personal Property of every description, including Business Interruption, owned by the Insured [or] held by them in trust, or for which they may be legally liable or may agree to insure.

Trial Ex. 584, at 3. The DIC insurers moved for summary judgment eliminating Alcoa's claims for recovery of damage to the groundwater at the Vancouver and Massena sites.[7] The basis of the insurers' motion is that in Washington and New York, the people of those states own the groundwater, and, therefore, Alcoa could not have an insurable interest in groundwater it did not own. The trial court denied the motion, holding, "Pennsylvania law permits the purchase of insurance to protect any property whose continued existence produces an economic benefit or whose destruction would result in a pecuniary loss, regardless of actual ownership." Clerk's Papers at 041156.

Under Pennsylvania law, "In order to have an insurable interest in property, a person must derive pecuniary advantage from the continued existence of the property or suffer pecuniary loss from its destruction." *Sotelo v. Washington Mut. Ins. Co.*, 734 A.2d 421, 423 (Pa. Super. Ct. 1999). "All definitions of an insurable interest import an interest . . . which can be enforced at law or in equity." *Kanefsky v. National Commercial Mut. Fire Ins. Co.*, 154 Pa. Super. 171, 35 A.2d 766, 768 (1944) (quoting *Prospect Dye Works v. Federal Ins. Co.*, 33 Pa. Super. 223, 227 (1907)). Thus, while it is true Alcoa cannot have "title" to the groundwater in either Washington or New York, it clearly has an interest in groundwater that can be enforced at law, i.e., its license to withdraw the groundwater for its own use, because that license conferred a pecuniary benefit on Alcoa.

---

[7]The motion was broader, but the Vancouver and Massena sites are the only issues on appeal.

The DIC insurers' reliance on Alcoa's lack of title to the groundwater is hypertechnical. We note Alcoa had permits to withdraw the groundwater for plant operations in New York and Washington. Plainly, if someone else contaminated that groundwater making it unusable by Alcoa there would be coverage for the damage to Alcoa's pecuniary interest in that groundwater. The trial court's holding was correct because in Pennsylvania the definition of insurable interest in property includes more than mere title to property. Alcoa derived both pecuniary benefit and potential pecuniary loss from its interest in the groundwater. It therefore had an insurable interest in the groundwater.

## C. Misrepresentation

The insurers argued to the jury Alcoa omitted material facts in its application for DIC insurance, and, as a result, the policies should be void ab initio under Pennsylvania law. "Pennsylvania common law has long recognized that contracts for insurance, procured by fraud, are void *ab initio*." *Klopp v. Keystone Ins. Cos.*, 528 Pa. 1, 5, 595 A.2d 1, 3 (1991). Washington law is the same. *See, e.g., Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wn.2d 50, 882 P.2d 703, 891 P.2d 718 (1994). The insurers argued Alcoa was aware of significant environmental damage to the property it sought to insure and failed to inform them of that damage.

The jury rejected the insurers' argument after the trial court submitted the following special verdict question to the jury: "In obtaining the DIC policies, did Alcoa make any material misrepresentations to the insurers?" The jury answered "No" as to all 52 policies the jury considered. The insurers then moved the trial court to enter a judgment notwithstanding the verdict of the jury (JNOV), pursuant to CR 50(b) and for a new trial pursuant to CR 59, alleging four improper arguments by Alcoa's counsel in closing argument. The trial court denied both motions. Finally, the insurers contend the trial court erred in ruling its denial of the misrepresentation defense is preclusive as to the remaining 32 sites.

■ Turning first to the motion for JNOV, the standard of review we apply for a trial court's ruling on a CR 50(b) motion is the following:

> In reviewing a JNOV, this court applies the same standard as the trial court. . . . A JNOV is proper only when the court can find, "as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict." *Brashear v. Puget Sound Power & Light Co.*, 100 Wn.2d 204, 208-09, 667 P.2d 78 (1983) (quoting *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)). A motion for a JNOV admits the truth of the opponent's evidence and all inferences that can be reasonably drawn therefrom, and requires the evidence be interpreted most strongly against the moving party and in the light most favorable to the opponent. No element of discretion is involved. *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 254-55, 386 P.2d 958 (1963).

*Goodman v. Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995).

■ "Under Pennsylvania law an insurance policy is void for misrepresentation when the insurer establishes three elements: (1) that the representation was false; (2) that the insured knew that the representation was false when made or made it in bad faith; and (3) that the representation was material to the risk being insured." *New York Life Ins. Co. v. Johnson*, 923 F.2d 279, 281 (3d Cir. 1991) (citing Pennsylvania cases). *Accord Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 102 (3d Cir. 1996). This is the common law rule that has been in effect since *Evans v. Penn Mut. Life Ins. Co.*, 322 Pa. 547, 186 A. 133 (1936). The rule is simply a version of the well-known common law principle, "Fraud renders a contract voidable by the innocent party." *Bird v. Penn Cent. Co.*, 334 F. Supp. 255, 258 (E.D. Pa. 1971) (citing Pennsylvania insurance cases). False applications for casualty insurance have also been a matter of statutory law in Pennsylvania since 1921:

> The falsity of any statement in the application for any policy covered by subdivision (b) [casualty insurance] of this article shall not bar the right to recovery thereunder, unless such

false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.

PA. STAT. ANN. tit. 40, § 757 (West 1999) (footnote omitted) (originally enacted as 1921 PA. LAWS 682, art. VI, § 622). The insurers make no reference to this statute.

The Pennsylvania Superior Court (the intermediate level appellate court in Pennsylvania) has recently explained the rule for proving fraud in the context of an insurance contract:

It is well established that "where the execution of a contract of insurance has been induced by fraudulent misrepresentations of the insured, the insurer may secure its cancellation[.]" *Tudor Ins. Co. v. Township of Stowe*, 697 A.2d 1010 (Pa.Super.1997) (quoting *New York Life Insurance Co. v. Brandwene*, 316 Pa. 218, 221, 172 A. 669, 669 (1934)). The burden of proving fraud is on the insurer who must prove, by clear and convincing evidence,[8] that on the application, the insured knowingly made false statements or knowingly failed to disclose information which was material to the risk against which the insured sought to be protected. *Id.* at 1016. In order to show a policy is void *ab initio* on the basis of fraud, the insurer must prove that the intent to deceive was deliberate. *Grimes v. Prudential Ins. Co. of America*, 401 Pa.Super. 245, 585 A.2d 29, 33 (1991).

Mere mistakes, inadvertently made, even though of material matters, or the failure to furnish all details asked for, where it appears that there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown.[9]

*Id.* (quoting *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa.

---

[8]The trial court instructed the jury to employ only the preponderance of the evidence burden of proof throughout. Jury Instruction No. 15 (Clerk's Papers at 047326). The parties have not assigned error to this instruction.

[9]This statement of the law flatly contradicts the insurers' assertion, "There is no requirement that there be an intent to deceive." Br. of Cross-Appellants at 20.

547, 553, 186 A. 133, 143 (1936)). The clear and convincing standard of proof is sufficiently met if the evidence presented was "so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Lessner v. Rubinson*, 527 Pa. 393, 400, 592 A.2d 678, 681 (1991). Nonetheless, "fraud . . . is never proclaimed from the housetops nor is it done otherwise than surreptitiously with every effort to conceal the truth of what is being done. So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances." *Shechter v. Shechter*, 366 Pa. 30, 33, 76 A.2d 753, 755 (1950).

*Rohm & Haas Co. v. Continental Cas. Co.*, 732 A.2d 1236, 1251-52 (Pa. Super. Ct. 1999).

The insurers argue Alcoa's actions satisfied all three prongs. First, they contend Alcoa did not reveal in its applications for DIC coverage its land had already been contaminated by industrial wastes. They treat this omission as a false representation. That there was damage to some of Alcoa's property prior to the time Alcoa requested insurance coverage from the insurers had been established by pretrial orders. Jury Instruction No. 20 detailed as much:

> As a result of rulings made prior to trial, I instruct you that, as a matter of law, you must take as established the following:
>
> (a)   Land and groundwater are real property covered under the DIC policies.
>
> (b)   Prior to July 1, 1977, Alcoa was aware that mercury, cyanide, and PCBs, in certain forms, under certain conditions, at some concentration, and through certain biological pathways, could be considered hazardous or toxic.
>
> (c)   Prior to July 1, 1977, Alcoa knew that it sustained mercury-related property damage at the Point Comfort facility in the following areas: the portion of Lavaca Bay leased by Alcoa, in the four Bauxite Residue Lakes, Dredge Island, and the Dredge Spoil Lake.
>
> (d)   No later than July 1, 1980, Alcoa knew that it sustained

PCB-related property damage at the Massena facility in the following waste management units: The Lubricating Waste Oil Lagoon and the Soluble Oil Lagoon.

(e) As of December 1978, Alcoa knew that cyanide had damaged the groundwater under the SPL pile at the Vancouver facility.

(f) Prior to July 1, 1977, Alcoa knew that fluoride had damaged the Settling Lagoons at the Vancouver facility. As of the start of the Vancouver Sludge Pond's operation in 1978, Alcoa was also aware of the fluoride-related damage to the pond.

Clerk's Papers at 049132. Question No. 4 on the Special Verdict Form asked, "When did Alcoa know of the property damage in each area or become substantially certain that such damage would occur [?]" In its answer, the jury indicated Alcoa knew of many areas where damage had occurred before Alcoa applied for insurance. Clerk's Papers at 049392-95.[10] Thus, the insurers appear to meet the first test for misrepresentation.

Second, the insurers contend Alcoa did not inform them of this damage when it applied for insurance. Alcoa disputes this contention. Alcoa asserts it did not knowingly or in bad faith fail to inform the insurers of the damage. The crux of Alcoa's argument is it was not aware the insurers needed information from Alcoa about environmental damage to its own property. This contention blends into the third prong, materiality, and does not refute the insurers' argument Alcoa did not inform them of environmental damage to its own property. The insurers appear to meet the second test for misrepresentation.

Third, the insurers contend Alcoa's omission of information about damage to its property from industrial wastes

---

[10]It is noteworthy the jury expended an extraordinary amount of time deliberating on Question No. 4. On August 21, 1996, the jury sent an inquiry to the trial judge: "We are deadlocked on many of the areas of Question #4. Do we proceed to Question No. 5 for those areas where, in Question #4, we have the required number of votes? The jury began deliberating on Question #4 on July 17, 1996." Clerk's Papers at 049227.

was material. Under Pennsylvania law, "Information is said to be material if knowledge or ignorance of it would naturally influence the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing the premium rate." *A.G. Allebach, Inc. v. Hurley*, 373 Pa. Super. 41, 540 A.2d 289, 295 (1988). The insurers assert, "[A]ny information pertaining to this property and insured-risk would, *a fortiori*, be material." Br. of Cross-Appellants at 25. But the insurers decline to confront the crucial question regarding misrepresentation: was information of damage material?

The trial court held it was not. In its order denying the motion for JNOV, the trial court said:

> As of 1977, when the Lexington policies were negotiated, there were no statutory requirements that the owner of an industrial facility clean up its own property, there was no indication that Alcoa had ever or would ever incur costs to remedy pollution-related damage on its own property, there was no indication that Alcoa was contemplating making claims for such damage, and there is no evidence that Alcoa had made pollution-related claims in the past. The jury could conclude that, as of 1977, the fact that the operation of Alcoa's waste management units had damaged its own property, where no claim had ever been made or was ever likely to be made regarding such damage, would not have been material to either party. The jury's findings of no material misrepresentations were, therefore, appropriate as to the Lexington policies.

Clerk's Papers at 050067.

The trial testimony of insurance company representatives is important regarding materiality. One representative testified the damage Alcoa did not report was not material because he did not believe the DIC policies covered environmental damage:

> Q. Well, today, [are] environmental assessment[s] . . . done in connection with underwriting property policies?
>
> A. DICwise, I don't believe so.
>
> Q. They are not done?

534

A. They are not done.

Q. I take it, then, that they weren't done in the 1977 to the 1984 time period either?

A. I don't think so.

Q. Mr. Daly, if environmental assessments are not done today, in connection with the issuance of the DIC policies, then that information is not material in determining whether or not to underwrite the DIC policies. Isn't that correct?

A. The information is not material to not write them?

Q. You testified that environmental assessments are not being done today?

A. I said I think so.

Q. You said that you think that they weren't being done in the 1977 to the 1984 time period either in connection with the issuing of the DIC policies; right?

A. Right.

Q. So that the information that one might get from the environmental assessments might not be material at the time of writing DIC policies?

A. Maybe so. I don't know for sure.

Q. If environmental assessments are not being done today in connection with the DIC policies, do you think that the information that an environmental assessment might generate would be material to issuing those policies today?

A. Yes.

Q. Why aren't they, why aren't environmental [assessments] done?

A. Because to this day I don't think that contamination and pollution are covered as a specific peril.

Report of Proceedings at 10972-73 (testimony of John Daly, a property underwriter with 22 years of experience. Report of Proceedings at 2499). Another insurance company executive was even more definite about the immateriality of

environmental damage to Alcoa's property to the decision to insure:

Q. Now, similarly, at the time that you were underwriting these policies, in 1983, these DIC policies, you didn't think that the policies covered contamination of land by waste generated by Alcoa; isn't that right?

A. I still don't.

Q. You still don't. All right. Now, Mr. York, at the time that you underwrote these policies, you really didn't know much about Alcoa's waste generation activities; isn't that right?

A. No, I did not.

Q. You don't recall really asking about any information about Alcoa's waste handling or generation activities; isn't that right?

A. I could see no relation to that to the subject of our property policies.

Q. You weren't really that concerned about Alcoa's waste generation, or about hazardous chemicals contaminating land, because you didn't think that contamination of the land was covered under those DIC policies through the underwriting. Isn't that right?

A. Correct.

Q. So that type of information was not really a primary consideration for you, when you were underwriting the policies. You were focused more on the flood exposures and the earthquake exposures and information relating to those types of exposures; isn't that right?

A. Yes.

Q. You don't recall having any particular concern at that time about any contamination or pollution exposures of Alcoa; isn't that right?

A. No. We would have, I testified earlier that how we would have approached underwriting to cover land and we just didn't really have a good feeling about that. We wouldn't have done it.

Q. I am asking you not to speculate what you would have done or thought, if you had known land was covered under these policies. I am talking about what you did think and what you were focused on at the time that you underwrote these policies at the time that you didn't think that land was covered under them; that is, that you weren't that focused or concerned about exposures relating to contamination for pollution. Isn't that right? . . .

A. I don't think that it is a very direct question, either. I am afraid you are kind of putting words into my mouth. You are not asking me what I thought. You are saying, "yada, yada, yada, is that a fair statement?"

Q. Well, let me try it again, Mr. York. I won't use "yada, yada, yada" in this sentence. At the time that you underwrote these Commonwealth policies, you don't recall having any particular concern about Alcoa's exposures relating to contamination or pollution; isn't that correct?

A. No, I don't recall any such concerns.

Report of Proceedings at 11095-97 (testimony of Hugh York, manager of the United States Property Underwriting Division of Commonwealth Insurance. Report of Proceedings at 11049-50). Thus, the jury heard testimony that allowed it to conclude the information Alcoa omitted about damage to its property was not material to the decision to issue insurance.

Because we are addressing a defense, a species of fraud in the inducement, that voids the insurance contract in its entirety from the outset, we are careful in applying this most extreme of remedies. Under Pennsylvania law, the test is, as it should be, a very rigorous one with a high burden on the insurers. Pennsylvania law abhors forfeitures. *Fogel Refrigerator Co. v. Oteri*, 391 Pa. 188, 137 A.2d 225, 231 (1958). Although Alcoa did not inform the insurers about pollution damage to Alcoa's property at the time Alcoa applied for insurance, the trial court was correct in holding pollution damage was not a material factor in the insurers' decision to insure because nobody considered pol-

lution damage to be covered by the DIC policies in the first instance. Failing of this third prong of the test for misrepresentation, the insurers have not met their burden to sustain a motion for JNOV.

We hold, therefore, there was sufficient evidence before the jury to sustain its verdict, and conclude the trial court did not err in denying the insurers' motion for JNOV.

We next turn to the insurers' contention they are entitled to a new trial because of misconduct by Alcoa's counsel in closing statements to the jury. After the jury verdict, the insurers moved for a new trial, referencing four allegedly improper and prejudicial comments by Alcoa's counsel during closing argument. The trial court denied the motion for a new trial in a written order.

Abuse of discretion is the standard of review for an order denying a motion for a new trial: "An order denying a new trial will not be reversed except for abuse of discretion. The criterion for testing abuse of discretion is: '[H]as such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial?' " *Moore v. Smith*, 89 Wn.2d 932, 942, 578 P.2d 26 (1978) (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)). *See also Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997) ("A much stronger showing of abuse of discretion will be required to set aside an order granting a new trial than an order denying one because the denial of a new trial 'concludes [the parties'] rights.' " (alteration in original)) (quoting *Baxter v. Greyhound Corp.*, 65 Wn.2d 421, 437, 397 P.2d 857 (1964)); *Seattle Operating Co. v. Cavanaugh*, 14 Wash. 701, 701, 44 P. 266 (1896). This rule of abuse of discretion specific to motions for a new trial stands in juxtaposition to the general test for abuse of discretion set forth in *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971): "that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons."

The grounds for granting a new trial are set forth at CR 59(a). The insurers rely on only one of the nine listed

grounds, CR 59(a)(2): "Misconduct of prevailing party or jury." Br. of Cross-Appellants as to Misrepresentation at 31. Such misconduct must "materially affect[ ] the substantial rights" of the moving party. CR 59(a).

Washington law on the standard for counsel misconduct as grounds for a new trial in a civil case is scant. In *Godley v. Gowen*, 89 Wash. 124, 129-30, 154 P. 141 (1916), a case predating adoption of our Civil Rules for Superior Court, we said:

> It is finally claimed that, in the opening statement of counsel for the plaintiff, a statement was made to the effect that, shortly after the accident, the defendant discharged the plaintiff from his employ and refused to pay his doctor's bill, and that this was misconduct which would warrant the granting of a new trial. When counsel made this statement it was objected to, and the court told the jury, in substance, that they should not consider statements of counsel unless the same were supported by the evidence. We think this was not such misconduct of counsel as would warrant the granting of a new trial.

*See also Freeman v. Intalco Aluminum Corp.*, 15 Wn. App. 677, 552 P.2d 214 (1976) (curative instruction sufficient to address alleged misconduct of counsel).

We have spoken at some length, however, on the criteria for mistrials in criminal cases. In *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129, 115 S. Ct. 2004, 131 L. Ed. 2d 1005 (1995), we stated:

> Trial courts are accorded discretion in denying a motion for mistrial; such denials will be overturned only when there is a "substantial likelihood" the prejudice affected the jury's verdict. *State v. Crane*, 116 Wn.2d 315, 332-33, 804 P.2d 10, *cert. denied*, 111 S. Ct. 2867 (1991). Trial courts "should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly". [*State v. ]Mak*, 105 Wn.2d [692,] at 701, [718 P.2d 407 (1986)] *quoted in State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

*See also State v. Gilcrist*, 91 Wn.2d 603, 612, 590 P.2d 809

(1979) ("As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which arise. . . . A mistrial should be granted only when 'nothing the trial court could have said or done would have remedied the harm done to the defendant.' " (citations omitted)). Thus, the trial court's issuance of a curative instruction may obviate the need for a new trial, even if there is misconduct.

■ In its written opinion on the motion for a new trial, the trial court employed the following rules for its decision:

> Pursuant to CR 59, a new trial should be granted when the prevailing party has engaged in misconduct that "materially affect[s] the substantial rights" of the losing party. Under Washington law, there are two prongs to the analysis: were counsel's remarks improper and, if so, did such remarks have a prejudicial effect (i.e., was there substantial likelihood that the remarks affected the jury's verdict)? See State v. Mak, 105 Wn.2d 692 (1986); State v. Russell, 125 Wn.2d 24, 85 (1994). Where both questions are answered in the positive, a new trial is necessary.

Order Denying Certain Defs.' Mot. for a New Trial at 1 (Clerk's Papers at 050703).

Ultimately, we generally agree with the trial court's two-part test, but we note the circumstances of a civil case, where life and liberty are not at issue, militate in favor of a standard that more generally upholds trial court decisions. One federal rule commentator noted the proper criteria for consideration:

> A new trial may properly be granted based on the prejudicial misconduct of counsel. As a general rule, the movant must establish that the conduct complained of constitutes misconduct (and not mere aggressive advocacy) and that the misconduct is prejudicial in the context of the entire record. . . . The movant must ordinarily have properly objected to the misconduct at trial, . . . and the misconduct must not have been cured by court instructions.

12 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 59.13[2]

[c][I][A], at 59-48 to 58-49 (Daniel R. Coquillette et al. eds., 3d ed. 1999).

The insurers want a new trial because of what they contend were improper statements by Alcoa's counsel during closing argument. They argue both in the trial court and in their briefs here that Alcoa made 11 improper statements or took improper positions to which the trial court sustained the insurers' objections. Unfortunately, they discuss only three alleged improper statements; they do not point to the location in the record where the others might be found. In any event, while the trial court considered the statements improper, it held they were not prejudicial.

The first allegedly improper closing argument was Alcoa's counsel telling the jury the insurers' defense of misrepresentation is nothing but a ruse to void the policies. The insurers' attorney objected on the ground Alcoa's counsel was improperly advising the jury of the legal effect of misrepresentation. The trial court upheld the objection.

The trial court conceded the argument was improper; it had been forbidden by an order granting a motion in limine. But the trial court went on to note the insurers' central contention throughout the trial was no coverage for a variety of reasons, among which misrepresentation was only one. The trial court also noted the jury was likely to know anyway that misrepresentation by Alcoa could lead to voiding of the policies because such language was contained in the policies the jurors had before them during their deliberations. The trial court concluded the jury was able to decide the case fairly, without passion or prejudice, despite the improper statement by Alcoa's counsel during closing argument.

The second claimed improper closing argument was a comment by Alcoa's counsel questioning the validity of one of the court's jury instructions. The insurers objected to the statement and the trial court sustained the objection, informing the jury it was bound by the court's orders. The trial court, in denying the motion for a new trial, held the

insurers were not prejudiced because there had been over three months of trial testimony on the very issue referenced by Alcoa's counsel. Thus, the improper remark "was not surprising." Clerk's Papers at 050707. We agree.

Next, the insurers argue they are entitled to a new trial because of the following improper remarks by Alcoa's counsel during closing argument:

.This case is about the truth. It's not about clever lawyering. Mr. Budd and I tried not to object very frequently. Why? Because we wanted you to hear everything.

Mr. Daar:    I'm sorry, that's not proper argument.

The Court: Yes, sustained. Disregard that, please.

Br. of Cross-Appellants as to Misrepresentation at 39; Report of Proceedings at 12165. The trial court instructed the jury in Jury Instruction No. 1, "The lawyers have the right and the duty to make any objections that they deem appropriate." Clerk's Papers at 050708. The improper statement regarding the number of objections is a flimsy basis on which to grant another trial.

In summary, the trial court observed:

There is no indication that the jury was swayed by passion or prejudice for or against any particular party or position. This jury was extremely thoughtful, competent, and diligent in their efforts to review the evidentiary record and answer the Special Verdict Form. Such dedication was noted repeatedly by both parties and the Court during trial and deliberations. The number and content of the jury inquiries propounded during deliberations indicates that they painstakingly considered the evidence before them in arriving at their decisions.

Clerk's Papers at 050706. In view of the trial court's opinion of the diligence of the jury, and the somewhat insubstantial issues the insurers raise to justify a new trial, we agree. The trial court did not abuse its discretion in denying the insurers a new trial on misrepresentation.

The final issue the insurers raise on misrepresentation has to do with the scope of the trial court's decision on that issue. At the end of the Phase I trial, the jury was asked on

the Special Verdict Form, "In obtaining any of the DIC policies, did Alcoa make any material misrepresentations to the insurers?" For every policy issued covering the three test sites from 1977 to 1984, the jury answered in the negative. The trial court subsequently held these findings were conclusive as to the remaining 32 sites:

> The finding of this jury that there were no material misrepresentations on Alcoa's part during the negotiations of the DIC policies is conclusive, and litigation on this issue is at an end. Should discovery identify specific instances where Alcoa knew of and actually incurred monetary losses in response to contamination-related damages on its own property prior to the inception date of the policies at issue, defendants' remedy may lie under CR 60(b)(3).[11]

Clerk's Papers at 050069.

The insurers assert the ruling unfairly precludes any defenses based on misrepresentation they might have for the remaining 32 sites, defenses they may not have detected or developed so far because they have not conducted discovery as to those 32 sites. But they ignore the reason animating the trial court's finding of no misrepresentation: the pollution damage to Alcoa's own property was not material to the insurers' insuring decision because such damage was not thought to be covered under the DIC policies. Additional fact-finding at the remaining sites cannot change the materiality consideration. As the trial court said, "[F]indings of non-fortuitous damage at other sites would not support a finding of material misrepresentation: such information was either immaterial at the time of contracting or was not misrepresented." Clerk's Papers at 050069. We agree. The trial court did not abuse its discretion in ruling the jury's finding of no misrepresentation applies to all the sites.

---

[11]CR 60(b)(3) pertains to obtaining relief from an order or judgment on the basis of newly discovered evidence.

## D. Pollution Exclusion Clause

The CGL policies provide insurance coverage for damage third-parties incur resulting from an "occurrence," which the Commercial Union policy, for example, defines as follows: " 'occurrence' means an injurious exposure to conditions which results, during the policy period, in personal injury or property damage or advertising offense neither expected nor intended from the standpoint of the Insured[.]" Clerk's Papers at 001125. The policies do not provide coverage, however, for costs Alcoa incurs to remedy damages stemming from environmental pollution or contamination because of pollution exclusions in the CGL policies. The pollution exclusion clause in the Commercial Union policy, for example, states:

> It is agreed that the insurance does not apply to bodily injury or property damaged arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Clerk's Papers at 001154. In other words, the CGL policy will not, as a general matter, cover damage to others by pollution the insured generates.

But the last phrase of the clause qualifies the pollution exclusion: the policy *will* cover pollution damage to others if the "discharge, dispersal, release or escape is sudden and accidental." Because of this qualification of the pollution exclusion, this policy provision is a qualified pollution exclusion clause. The case at bar concerns the meaning of the phrase, "sudden and accidental." Alcoa contends it is entitled to coverage because "sudden and accidental" encompasses as much as 40 years of Alcoa's gradual, pollution-generating activity. The trial court agreed with the CGL insurers and dismissed Alcoa's claims, based on the pollu-

tion clause, in a series of orders.[12] The trial court relied on extant Pennsylvania law defining "sudden and accidental":

> This court will not revisit established Pennsylvania law. That law holds that the pollution exclusion clause is unambiguous. In Pennsylvania, the term "sudden and accidental" is not another way of saying "unexpected and unintended" but includes a temporal element requiring an abrupt and time-limited discharge.

Clerk's Papers at 029348. In its earlier order dismissing Alcoa's claims against Commercial Union (Clerk's Papers at 029856), the trial court cited *Lower Paxton Township v. U.S. Fidelity & Guaranty Co.*, 383 Pa. Super. 558, 557 A.2d 393, 402 (1989), where the Pennsylvania Superior Court said: "To read 'sudden and accidental' to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement—abruptness of the pollution discharge."

We construed a nearly identical qualified pollution exclusion clause in *Queen City Farms*, 126 Wn.2d at 74, but we found coverage, holding the phrase " 'sudden and accidental' means 'unexpected and unintended'." *Id.* at 90. In the case at bar, however, *Queen City Farms* does not apply; Pennsylvania law controls. In its order granting Commercial Union's motion to dismiss, the trial court specifically noted the conflict between Pennsylvania and Washington law in the interpretation of the qualified pollution exclusion clause and concluded Pennsylvania law applied to the interpretation of the clause. No party disputes the trial court's application of Pennsylvania law to the pollution exclusion issue.

---

[12]The various CGL insurers moved for summary judgment at different times. As the early motions proved successful, the subsequent motions expanded in scope, ultimately resulting in orders granting summary judgments of dismissal to all the CGL insurers for all but 2 of the 35 sites on the basis of the pollution exclusion clause. In a posttrial order, the trial court listed in detail all of the many orders it had entered on the summary judgment motions of the various CGL insurers. It is not necessary to reiterate them here. The two sites for which the trial court did not dismiss Alcoa's claim as to the pollution exclusion clause involve factual questions that require a trial for resolution. They are not at issue in this appeal.

Alcoa's appeal from the lower court's pollution exclusion clause holding is limited to a single issue: whether the CGL insurers are estopped to deny coverage because of misrepresentations they made to the Pennsylvania Insurance Department when they applied in 1970 for permission to use the pollution exclusion clause. The alleged misrepresentation occurred in an explanatory memorandum the insurance industry submitted to the Pennsylvania Insurance Department along with its application for the pollution exclusion clause. The memorandum reads, in pertinent part:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above explanation clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 740 A.2d 1179, 1189 n.7 (Pa. Super. Ct. 1999). This argument is what courts have referred to as regulatory estoppel, a species of fraud in the inducement. Alcoa claims that but for the fraudulent misrepresentation by the insurance industry as to the meaning and effect of the pollution exclusion clause, thereby inducing the Pennsylvania Insurance Department to approve use of the clause in CGL policies, Alcoa would not have been left without coverage.

It is not necessary to discuss this claim in detail because in a December 1999 case, the Pennsylvania Superior Court, sitting en banc, settled and disposed of the regulatory estoppel issue. In *Sunbeam Corp.*, the court held the insured failed to demonstrate the Pennsylvania Insurance Department had *relied* on the alleged misrepresentation in making the decision to allow the pollution exclusion clause. Actual reliance on the alleged false statement is one of the

necessary elements of fraud.[13] Indeed, the Pennsylvania court found it was unlikely a regulatory body like the Pennsylvania Insurance Department would simply abandon its statutory charge to determine the meaning of a proposed clause in an insurance contract and rely solely on the insurance industry's representations as to the meaning of the clause. Richard W. Simpson, who was Assistant Director of the Bureau of Regulation of Rates of the Pennsylvania Insurance Department (Clerk's Papers at 001659), averred in a declaration, "As stated above, I was not mislead [sic] or deceived by the IRB's filings of 1966 or 1970 nor to the best of my knowledge was any Department staff member misled or deceived." Clerk's Papers at 001661. As the *Sunbeam* court said, citing the language of the Pennsylvania trial court:

> [Sunbeam's] regulatory estoppel argument requires that I find that after reading the pollution exclusion, the members of the regulatory bodies and their staffs looked to the insurance industry's explanation of the proposed pollution exclusion to determine the scope of the exclusion. However, it is far more reasonable to assume that a regulatory body would attach its own meaning to the language of a proposed exclusion and that it would, in fact, be suspicious of an industry explanation which appeared to be somewhat inconsistent with the proposed language.

*Sunbeam*, 740 A.2d at 1190 (alteration in original).

In addition to disposing of the regulatory estoppel argument against Alcoa, *Sunbeam* reaffirmed *Lower Paxton*'s definition of "sudden and accidental": "the word 'sudden,' construed in its plain, natural, and ordinary sense, includes a temporal element and means 'abrupt' and 'last-

---

[13]In Pennsylvania, "To prove fraud, a plaintiff must demonstrate: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004, 1014 (Pa. Super. Ct. 1999). *Sunbeam* held there was no reliance at all, let alone justifiable reliance.

ing only a short time.' " *Sunbeam*, 740 A.2d at 1188. These are the precise words the trial court here relied upon in dismissing Alcoa's claims under the pollution exclusion clause. As a result of *Sunbeam*, Alcoa is left without a triable issue of fact unless it can show that for at least some of the polluted sites the pollution that occurred was "sudden and accidental," as Pennsylvania defines the phrase.

In its written decision on the CGL insurers' motion for summary judgment based on the pollution exclusion clause, the trial court held, "It is the Plaintiffs burden to establish coverage and that there are facts to support an exception to the pollution exclusion clause." Clerk's Papers at 029354. Alcoa does not disagree it had such a burden. The trial court discussed and rejected several of Alcoa's contentions that discharges of pollutants were, in fact, abrupt.

On appeal, Alcoa addresses the factual issues in a single paragraph, asserting, "If the trial court had applied the proper legal standard, Alcoa's claims would be precluded by the qualified pollution exclusion only if the release of pollutants were non-accidental from Alcoa's standpoint." Br. of Appellants at 103. Because *Sunbeam* establishes the trial court *did* apply the proper legal standard, and Alcoa has not argued triable issues of fact arise from *that* standard, the trial court correctly granted the summary judgment motions dismissing Alcoa's claims against the CGL insurers under Pennsylvania law.

## E. Suit Limitation Clauses

The next coverage issue we address involves the suit limitations clauses found in the DIC policies. Such clauses limit the time for Alcoa to file suit for the coverage under the policies. An example of such a clause appears in the Bellefonte policy:

> **SUIT.** No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim, provided, however, that if by the

548

laws of the state within which this policy is issued such limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such state.

Trial Ex. 924, at 2. "This is not a statute of limitation imposed by law; it is a contractual undertaking between the parties and the limitation on the time for bringing suit is imposed by the parties to the contract." *Lardas v. Underwriters Ins. Co.*, 426 Pa. 47, 231 A.2d 740, 741-42 (1967). Suit limitation clauses are ubiquitous:

> Almost all property policies contain a "suit limitation clause," i.e., a clause designed to shorten the period of time within which an action on or under the policy may be brought against the insurer by the policyholder. Typically, these time limits are from twelve months to two years. Most states, by statute, implicitly recognize the validity of suit limitation clauses by prohibiting the use of such clauses in actions brought "less" than twelve months after the loss.

Dale L. Kingman, *First Party Property Policies and Pollution Coverage*, 28 Gonz. L. Rev. 449, 493 (1992/93). "Suit-limitation clauses may represent a valid and equitable defense when pollution losses are reported on first-party policies that have long since expired." Jerry Provencher, *First-Party Claims with an Environmental Twist*, 23-SUM Brief (ABA) 8, 35 (1994). "By statute, Pennsylvania law provides that contractual limitations of suit provisions, which are shorter than the applicable statute of limitations, are valid provided they are not manifestly unreasonable." *Caln Village Assocs. v. Home Indem. Co.*, 75 F. Supp. 2d 404, 409 (E.D. Pa. 1999) (citing 42 Pa. Cons. Stat. Ann. § 5501(a)). Washington insurance law similarly permits suit limitation clauses, provided "such limitation shall not be to a period of less than one year from the date of the loss." RCW 48.18.200(1)(c). In effect, these statutes authorize property insurers to contract for repose provisions of fairly short duration. They cut off the long tail on claims so often found in third party coverage.

The suit limitation issue in the present case arises

because the DIC insurers alleged as an affirmative defense Alcoa had not complied with the suit limitation provision. Alcoa asserts the document containing the suit limitation was not a part of the insurance contract Alcoa made with the DIC insurers, and it should not be bound by the suit limitation provision. The jury found otherwise and, as a result, the trial court dismissed most of Alcoa's claims against the 1977-83 DIC insurers on the basis that Alcoa's action was untimely. The DIC insurers cross-appealed, contending the trial court erroneously selected the time at which the suit limitations periods began to run.

The initial question we must address is whether Alcoa is bound by the suit limitations clauses, most of which appeared in policy jackets given to Alcoa's brokers after coverage was placed. In conjunction with its own insurance brokers, Alcoa prepared a long, detailed document specifying the terms and conditions of the coverage it sought. Alcoa's brokers negotiated with various DIC insurers over a period of months until agreement was reached as to the terms and conditions of coverage. An example of this document appears at Trial Ex. 584. The parties refer to this document as the "manuscript form."

The insurers all accepted the proposed insurance contract and issued binders confirming the existence of insurance. Later, they sent to Alcoa's brokers, but not to Alcoa, what are confusingly referred to in this case as policy jackets. These are not jackets in the sense of file jackets; they are instead the basic insurance policy containing much of what is ordinarily referred to as boilerplate or small print. The insurers assert these are part of the basic insurance contract between them and Alcoa. Alcoa asserts they are not part of the contract because Alcoa never negotiated the terms of the policy jackets and because they never received them (only the brokers received them). Whether the policy jackets are considered part of the agreement between Alcoa and each DIC insurer is important because the suit limitation clause is found in the policy jackets.

Stage 1 of the Phase I trial was devoted to the question

of whether the policy jackets were part of the DIC policies. Jury Instruction No. 1 summarized the issues for the jury:

Plaintiffs, Aluminum Company of America and Northwest Alloys, Inc. (hereinafter "Alcoa" or "plaintiffs") brought this lawsuit seeking a declaration that numerous first-party insurance policies issued to Alcoa provide coverage for environmental clean-up costs at plaintiffs' facilities in Vancouver, Washington, Massena, New York, and Point Comfort, Texas.

The insurance policies at issue were known as Difference in Conditions policies and were in effect for various periods between July 1, 1977 and July 1, 1984.

The first stage of this trial involves resolution of issues with respect to what documents make up the 1977-1980 policy and the 1980-1983 policies[.]

A.  The first issue will involve the Lexington Insurance Company policy. The Lexington policy was procured by Alcoa through the broker Fairfield & Ellis, Inc. Lexington delivered its original policy to Fairfield & Ellis, which then delivered the policy to Alcoa. Lexington contends that the policy consisted of a typed manuscript form, a policy jacket containing terms and conditions numbers 1-25, and various endorsements, and that Alcoa received all of these documents through Fairfield & Ellis. Lexington also contends that Alcoa received a complete, signed, daily report and/or agent's record (referred to as a "daily") which contained the same twenty-five terms and conditions found in the original policy jacket, although in a different format.

Alcoa contends that the manuscript form, cover page, declarations page, and various endorsements constituted the complete Lexington policy and that the page of the policy jacket which contained conditions 6-25 was never received by Alcoa and is, therefore, not part of the policy.

Clerk's Papers at 047309. On a Special Verdict Form, the jury answered "yes" to the following key interrogatory: "Did Fairfield & Ellis act as Alcoa's agent for purposes of receipt of the original Lexington policy?" Clerk's Papers at 050791. The jury also answered "no" to another key interrogatory: "Was it reasonable for Alcoa (and its agent, if ap-

plicable) to believe that conditions 6-25 of the Lexington policy jacket were not to be considered part of the policy?" Thus, as a factual matter, the jury concluded the broker was Alcoa's agent for receipt of the policy jackets and Alcoa was unreasonable in not believing the policy jacket (containing the suit limitation clause) was part of its insurance contract with Lexington. The jury also answered the same interrogatories with respect to the policies issued in subsequent years, finding in some cases the broker was not Alcoa's agent for receipt of the policy jackets, but that in all cases for which the broker was the agent, it was unreasonable for the broker not to believe the policy jackets were part of the insurance contract.

Alcoa now argues as a matter of law the policy jackets were unilateral attempts to modify the insurance contract, and the "manuscript form" encompassed its entire contract with the DIC insurers, stating, "Neither the quotations nor the proposed policy wording [i.e., the manuscript form] mentioned the policy jackets or their conditions." Br. of Appellants at 25. Alcoa is incorrect. Alcoa's manuscript form *specifically referred to* another document: "PARAMOUNT CLAUSE: The conditions contained in this form shall supersede those of the basic policy to which this form is attached wherever the same may conflict." Trial Ex. 584, at 9. Thus, in the document Alcoa itself prepared and submitted to the DIC insurers, Alcoa made reference to the "basic policy," i.e., policy jacket, that was to be attached to the manuscript form. From the outset, Alcoa understood there was to be an additional writing, the policy jacket, that was to be a part of the insurance contract. The question of whether it was unreasonable for Alcoa not to believe the policy jackets were included in the policies was properly before the jurors, who found against Alcoa.

Alcoa also argues it never actually received the policy jackets because, it asserts, under Pennsylvania law, insurance brokers are not agents for the receipt of policies. Alcoa cites the following provision from Pennsylvania's administrative code: when an insurance company [an

entity] "gives a policy, either new or renewal, to a broker for delivery to the insured, the broker shall be considered an agent of the entity for delivery of that one policy." 31 PA. CODE § 37.45(c) (1997). The essence of Alcoa's contention appears to be that this regulatory provision *forbids* brokers from being the agent of an insured for purposes of policy delivery so that Alcoa could not be held to have constructively received the policy jackets. Alcoa reads too much into this regulation.

As Alcoa would have it, the Pennsylvania administrative code would make illegal any express contract between an insured and its broker that would have the broker serve as an agent for the delivery of an insurance policy. This would be a palpably absurd result.

▇ Pennsylvania law has long recognized the validity of a dual agency relationship involving insurance brokers. In *Rossi v. Firemen's Ins. Co.*, 310 Pa. 242, 165 A. 16, 18 (1932), the Pennsylvania Supreme Court said:

> Defendant contends, however, that even if there were such an arrangement, Blose could not, as a matter of public policy, act as agent for both parties in the making of a contract of insurance; the necessary effect of this argument being that a contract, such as the one here sued upon, which he undertook to make while acting in such dual capacity, would be voidable. This contention is unsound. Of course, on the principle that "no man can serve two masters," an agent cannot act as such for both parties to a transaction where the skill and judgment which he should exercise for the one might conflict with the skill and judgment which he should exercise for the other. *Everhart v. Searle*, 71 Pa. 256 [1872]; *Sarshik v. Fink*, 292 Pa. 256, 141 A. 39 [1928]. But this rule has no application where the duties of the agent to the two principals are of such nature that there can be no conflict between his duty of loyalty to the one and his duty of loyalty to the other.

*Accord John Conlon Coal Co. v. Westchester Fire Ins. Co.*, 16 F. Supp. 93, 96 (M.D. Pa. 1936), *aff'd*, 92 F.2d 160, *cert. denied*, 302 U.S. 751, 58 S. Ct. 271, 82 L. Ed. 581 (1937); *Faramelli v. Potomac Ins. Co.*, 346 Pa. 228, 29 A.2d 674,

676 (1943). With respect to the delivery of the policy jackets, there were no conflicts in the brokers' duty of loyalty; it was in the interest of Alcoa and the insurers for the brokers to deliver the policy jackets.

Here, the jury found from the trial evidence there was in fact an agency relationship between Alcoa and its brokers for the delivery of the policy jackets. There is nothing unlawful or contrary to public policy about such an agency relationship. That the Pennsylvania administrative code establishes the brokers as agents of the insurers for delivery of the policy jackets does not obviate the agency relationship between Alcoa and the brokers for delivery of the policy jackets, which the jury found existed as a matter of fact. The regulation describes the relationship between a broker and the insurer as a matter of law. But the regulation does not foreclose other relationships. Here, the brokers were dual agents. The jury's finding was not improper as a matter of law.

In its interpretation of the suit limitations clauses, the trial court held the suit limitations began to run from periods other than the inception of the environmental damage. For example, the trial court said, "knowledge that the loss or damage for which it now claims insurance has the potential to involve a policy of insurance triggers the suit limitation clock for that policy." Clerk's Papers at 048114. In another order, the trial court held the limitation period commenced only after the insured concluded its costs would exceed the deductible. These determinations are not correct under Pennsylvania law.

█ In Pennsylvania, the suit limitation clause "runs from the date the loss insured against occurred." *Caln Village*, 75 F. Supp. 2d at 411. The task for the trial court is to determine when the loss insured against occurred. *Id.*

> In Pennsylvania, courts apply an "effects" analysis to determine when an occurrence happens. . . . Under an effects analysis, when an occurrence happens is determined by reference to the time when the injurious effects of the occurrence take place. . . . Accordingly, the time or date the direct physical

damage or loss occurs for purposes of the suit limitations clauses at issue here is ascertained by determining when the injurious effects first manifest themselves in a way that would put a reasonable person on notice of injury.

*Id. Accord Conway v. State Farm Fire & Cas. Co.*, 1999 WL 545009, *3 (E.D. Pa. 1999) (applying Pennsylvania law): "The year [time limit in the suit limitation clause] begins to run on the date of the destructive event, regardless of the date the loss is actually discovered." Thus, the DIC insurers are correct when they assert, "[T]he occurrence and the physical loss are one and the same, and those portions of Alcoa's claim that involve losses admitted to have been discovered before December 3, 1991 . . . must be dismissed accordingly." Resp't's Revised Br. on Suit Limitation, Allocation, and Fortuity Issues at 38.

As a final matter, Alcoa contends the trial court interpreted the suit limitation clauses incorrectly in the Lexington and First State policies, both of which were issued in Massachusetts. The parties agree Massachusetts law controls for the interpretation of these policies. Under Massachusetts law with respect to suit limitations:

> No company and no officer or agent thereof shall make, issue or deliver any policy of insurance . . . containing any condition, stipulation or agreement . . . limiting the time for commencing actions against it to a period of less than two years from the time when the cause of action accrues . . . . Any such condition, stipulation or agreement shall be void.

MASS. GEN. LAWS ANN. ch. 175, § 22 (West 1997). Based on this statute, the trial court held Alcoa had to "bring suit . . . within twenty-four months of discovery of the occurrence which gives rise to the claim, as that phrase has been interpreted above." Clerk's Papers at 048109. The trial court had held "discovery of the occurrence" to mean "the discovery of both the occurrence AND the potential or foreseeable existence of a claim under each policy." *Id.* Because Alcoa did not bring suit until December 1992, long after it had learned of damage to its property in the late 1970s and

early 1980s, the suit limitation provision barred it from bringing the present suit.

■ Alcoa disputes the trial court ruling because it claims the phrase "cause of action accrues" in the Massachusetts statute is equivalent to breach of contract by the insurers. Alcoa is correct. The Supreme Judicial Court of Massachusetts has interpreted the term "cause of action accrues" to mean the point at which the insured's cause of action against the insurer ripens, i.e., when the insurer denies coverage. *See Barton v. Automobile Ins. Co.*, 309 Mass. 128, 34 N.E.2d 516 (1941). *See also Goldsmith v. Reliance Ins. Co.*, 353 Mass. 99, 228 N.E.2d 704 (1967). Alcoa's claims under these Massachusetts-based policies are therefore not barred by the suit limitation clause.

While the trial court did not err in holding Alcoa's brokers were agents for the delivery of the policy jackets, and the policy jackets were part of the insurance contracts, the trial court erred in its treatment of when the repose period of the suit limitations clause commences under Pennsylvania and Massachusetts law. We therefore reverse the trial court's conclusion at Paragraph I(B) of the Amended Order Granting in Part Defendants' Motion for Summary Judgment re: Suit Limitation, filed May 15, 1996, and remand the case for further proceedings consistent with the correct standard under Pennsylvania and Massachusetts law.[14]

## F. Fortuity

The largest issue in the case was the fortuity issue, which consumed at least half the trial time and at least half of the jury deliberation period. "Implicit in the concept of insurance is that the loss occur as a result of a fortuitous event not one planned, intended, or anticipated." 7 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 101:2, at 101-8 (1997). "The fortuity principle is central to the no-

---

[14]Our holding here resolves Alcoa's Assignment of Error No. 13, which assigned error to the trial court's entire order of May 15, 1996. As noted in the text above, however, we are here reversing only Paragraph I(B) of the order.

tion of what constitutes insurance. The insurer will not and should not be asked to provide coverage for a loss that is reasonably certain or expected to occur within the policy period." 1 ERIC MILLS HOLMES & MARK S. RHODES, APPLEMAN ON INSURANCE 2D § 1.4, at 26 (1996).

In Washington, we call the fortuity principle the known risk principle, and first enunciated it in *Public Utility District No. 1 v. International Insurance Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994): "The known risk defense is premised on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased." *Accord Hillhaven Properties Ltd. v. Sellen Constr. Co.*, 133 Wn.2d 751, 767, 948 P.2d 796 (1997) (extending known risk principle to first-party insurance). Moreover, "The knowledge that some loss may occur in the future is the driving force behind the purchase of insurance." *Public Util. Dist. No. 1*, 124 Wn.2d at 808. "The known risk, known loss, and loss in progress defenses are generally considered to be part of the 'fortuity' requirement that runs throughout insurance law." 7 COUCH ON INSURANCE § 102:9, at 102-24.

Oddly, the fortuity principle never appears in insurance contracts. The principle is rooted in common law and in the statutes of at least six states. M. Elizabeth Medaglia, et al., *The Status of Certain Nonfortuity Defenses in Casualty Insurance Coverage*, 30 TORT & INS. L.J. 943, 986 (1995) (listing state statutes). The fortuity principle has the effect of an exclusion. That is, an all-risk policy might provide coverage for all risks minus named exclusions, but never provides coverage for nonfortuitous events, even though nonfortuitous events are not named exclusions in the policy. For this reason, the fortuity principle is sometimes called the unnamed exclusion. Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 FORUM 222, 222 (1985).[15]

---

[15]We note that fortuity is expressly provided for in most third party insurance policies. Such policies require an "accident" or "occurrence" to trigger coverage.

From the outset, the DIC insurers raised lack of fortuity as an affirmative defense. For instance, Columbia Casualty Company alleged in its answer:

> Plaintiffs' claims are barred to the extent that the Plaintiffs were aware of alleged contamination to its property prior to the inception of this Defendant's policies as there was no "risk of loss" or no fortuitous loss.

Clerk's Papers at 000294. The policies at issue all incepted in 1977 and later. The DIC insurers assert Alcoa knew long before 1977 its disposal and handling of toxic chemicals were causing damage to Alcoa's property. For instance, the insurers claim Alcoa knew as early as 1969 it was losing 305 pounds of mercury a day. They also claim Alcoa knew about the hazards of polychlorinated biphenyls (PCBs) by the mid-1970s. Because of this alleged knowledge by Alcoa, the DIC insurers contend the fortuity principle prevents coverage. Certain of the DIC insurers moved for summary judgment on fortuity grounds.

The difficulty for the trial court, and now this Court on appeal, is deciding what legal principles to apply to the facts, which are not in dispute. While Pennsylvania law applies in this case, there was no Pennsylvania law on the fortuity defense or known loss doctrine at the time of the trial court's decision. "The 'known loss' doctrine has not been tested in the state courts of Pennsylvania." *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F. Supp. 362, 375 (D.N.J. 1995). The trial court had to predict what rules of law governing fortuity a Pennsylvania court would apply.

---

Often, those policies also expressly exclude coverage for intentional conduct, i.e., conduct expected or intended from the insured's standpoint. Moreover, "intentional, willful, criminal, and similar conduct may be held 'uninsurable' as a matter of public policy, regardless of whether such conduct is excluded by the contract language." 7 COUCH § 103:23, at 103-50.

We find some discomfort in being asked to give effect to an "unnamed" exclusion in an insurance contract, an exclusion that purportedly exists not as a matter of contract but as a matter of common law. Insurers know how to write exclusions to coverage. We wonder why they have left the fortuity exclusion to courts to find and interpret. It is conceivable, particularly for a property insurer, that an insurer might choose to write a policy indemnifying the insured for losses that may be in whole or in part nonfortuitous. No party has, however, contended fortuity is *not* part of the coverage equation here, so we leave any misgivings we may have to another day.

The trial court selected the following legal principles to inform its decision:

[A] loss or damage is no longer fortuitous, and therefore no longer insurable:

1. when the insured knows or is substantially certain that it has on its property specific substances; and

2. when the insured knows or is substantially certain that these substances had or were going to "damage" the insured property. Knowledge of "damage" to real property for fortuity purposes can arise in various ways, including, but not limited to:

   a. knowledge of a hazard to the reasonably apparent or anticipated flora and fauna that could be exposed on the insured premises (employees, wildlife, plants, vegetation, organisms); or

   b. knowledge that the property is unfit or unusable for reasonably foreseeable uses of the property; or

   c. knowledge of circumstances or facts which Alcoa believed constituted harm or damage to its property; or

   d. knowledge of circumstances or facts from which an ordinary person would conclude that the property had been damaged.

Clerk's Papers at 042650. The trial court held it must look to the *subjective* knowledge of the insured as to damage to the insured's property. In other words, what did the insured know at the time it purchased a policy, and when did it know it? In the trial court's view, if the evidence supported a finding the insured knew a loss was the substantially probable result of the insured's intentional conduct, there was no fortuity, and hence no coverage.

The trial court's summary explication of the fortuity principle appears at Jury Instruction No. 14:

If you find that there is damage, as described in Instruction No. 12, in the various areas at Vancouver, Massena, and Point

Comfort, you must then determine when Alcoa learned of such damage.

The DIC policies provide coverage for property damage suffered by Alcoa only if such damage was "fortuitous"—that means so long as the damage was unknown, accidental, unintended, or the result of a chance event. Damage is not accidental if Alcoa intended to cause such damage, knew it had already occurred, or knew that there was a substantial certainty that its business conduct would result in such damage. Any damage that was known to Alcoa prior to the policy period, or intended or known by Alcoa to be substantially certain to occur before or during the policy period, is not covered by a DIC policy. Once known, or known to be substantially certain, damage is not fortuitous for any subsequent policy.

Alcoa has the burden of showing, by the preponderance of the evidence, that it did not know, at the time of inception of each policy year, that the losses for which it seeks recovery under the policies had occurred or were occurring and that it did not intend to cause the losses or know that the losses were the substantially certain result of its conduct. For any damage which you find to be fortuitous as of July 1, 1977, you will still need to determine if Alcoa knew that such damage had occurred, was then occurring, or was substantially certain to occur between 1977 and 1984.

Clerk's Papers at 049126.

Applying these principles to the facts relating to Alcoa's subjective knowledge, the trial court entered mixed rulings of law on summary judgment as to the various pollutants at the three test sites. With regard to mercury contamination, the trial court ruled as a matter of law Alcoa knew mercury can pose hazards to workers and the environment. Moreover, because Alcoa had learned from the Texas Water Quality Board in 1970 that its mercury discharges into Lavaca Bay at Point Comfort, Texas had injured aquatic life and made the waters of the bay harmful and potentially toxic, the trial court ruled as a matter of law Alcoa had knowledge of damage there. The trial court did find issues of fact concerning Alcoa's knowledge of soil contamination,

and therefore granted only in part the DIC insurers' motion for summary judgment based on fortuity with respect to mercury.

With respect to PCB contamination, the trial court ruled as a matter of law Alcoa knew prior to the inception of the earliest policy PCBs posed a threat to both the environment and living organisms. There was no consensus, however, until 1979 on the level of PCB contamination that would cause harm. In 1979, the Environmental Protection Agency decided on 50 ppm as a new threshold level below which, if industry were forced to comply, industry would be unreasonably injured. The trial court fastened on this standard as the level above which, as a matter of law, real property is damaged. Thus, for all the disposal sites at Massena, New York, where sampling had shown concentrations above 50 ppm in 1979, policies issued for those sites in 1980, 1981, and 1983 failed the fortuity principle, and the DIC insurers were granted summary judgment for those policies. As to other areas that could not show contamination levels above 50 ppm, the trial court denied the insurers' summary judgment motion.

With regard to cyanide contamination, the trial court held there was no question Alcoa knew before 1977 of the harm cyanide could cause to humans, aquatic life, and the environment if it were discharged directly into water. It held as matter of law damage from cyanide contamination was not fortuitous for the cyanide that had not moved, and was not fortuitous after 1978 for the cyanide that had moved and reached groundwater, because Alcoa learned of this fact in 1978. Clerk's Papers at 042658-59.

All of these rulings were pretrial rulings on motions for summary judgment. The trial court gave Instruction No. 20 (Stage 2), which is quoted above at 531-32 (Clerk's Papers at 049132).

Question No. 4 of the Special Verdict Form asked the jurors, "When did Alcoa know of the property damage in each area or become substantially certain that such damage would occur (dates should be stated as 'pre-7/1/77,' a

policy year between 7/1/77 and 7/1/84, or 'post-7/1/84')?"
Clerk's Papers at 050803-06. Out of 85 total subareas at
the three test sites, the jury was unable to establish Alcoa's
knowledge for 33 of them. At the conclusion of the trial,
the trial court set out in concise form all of the claims it
had dismissed because of lack of fortuity, identified by area
and policy, as well as the areas where the damage was for-
tuitous.

While the trial court placed the burden of proving fortu-
ity on Alcoa, it failed to note that on motions for summary
judgment, "One who moves for summary judgment has the
burden of proving that there is no genuine issue of facts,
irrespective of whether he or his opponent would, at the
trial, have the burden of proof on the issue concerned."
*Preston v. Duncan*, 55 Wn.2d 678, 682, 349 P.2d 605 (1960)
(typeface omitted). Thus, because the insurers moved for
summary judgment, they had the burden of proving there
was no issue of fact with respect to lack of fortuity. The
insurers did, in fact, come forward with facts tending to
show Alcoa had the requisite knowledge to eliminate fortu-
ity.

The issue on appeal, however, is who bears the burden of
proof at trial. The trial court certified the case under CR
54(b), inter alia, specifically to obtain a determination of
that issue. In assigning the burden of proof to Alcoa, the
trial court was predicting what a Pennsylvania court would
do. The trial court observed:

> Where the facts surrounding the claim are not clearly fortu-
> itous, it is fair and equitable to place the burden on the insured
> to provide additional evidence tending to show that its losses
> were in fact the type of unexpected and unintended injuries
> that satisfy the fortuity doctrine. Since the fortuity inquiry
> revolves around the subjective knowledge of the insured,
> plaintiffs are in the best position to explain how seemingly
> foreseeable results of intentional business decisions could have
> been unexpected and unintended from their point of view.
> Contrarily, defendants have no access to plaintiffs' state of
> mind and would be hard pressed to show subjective intent or
> knowledge.

Clerk's Papers at 050761. Subsequent to the Phase I trial, however, the Court of Appeals for the Third Circuit, predicting Pennsylvania law, held it was *an insurer's* burden to prove lack of fortuity. *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (insurer has burden to prove applicability of exclusions, which act as affirmative defenses). While this decision is not, of course, binding on a Pennsylvania court, a Pennsylvania court is likely to consider it as strong persuasive authority.

The *Koppers* court said: "As with exclusions stated in an insurance policy itself, when an insurer relies on public policy [i.e., the fortuity principle] to deny coverage of a claim, the insurer must bear the burden." *Koppers*, 98 F.3d at 1447. A district court, following *Koppers*, said:

> Under Pennsylvania law, the insured bears the burden of proving that its claim falls within the policy's affirmative grant of coverage. *See Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996). The burden of proving the applicability of any exclusions or limitations on coverage, however, lies with the insurer, as those are affirmative defenses. *See id.* Moreover, the court must construe policy exclusions strictly against the insurer.

*Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438, 442 (M.D. Pa. 1998).

■ We agree with the *Koppers* court on the burden of proof, and are persuaded it is a better predictor of Pennsylvania law than the trial court's holding. Alcoa can show its damage falls within the insuring clause, as the DIC policies cover "all risks of direct physical loss or damage." Trial Ex. 1578-B, at 2. In the ordinary course, it should then be up to the insurer to come forward with some reason why an exclusion applies. Fortuity is, in effect, an exclusion, and it logically should be the burden of the insurer to plead and prove the exclusion, as *Koppers* directed.

■ Additionally, Alcoa, in opposing the motions for summary judgment, presented the trial court with voluminous testimony from its employees and various experts to

the effect it did not know contamination from PCBs and mercury was causing damage at the time it purchased the DIC policies. Alcoa's argument is persuasive under the law the trial court predicted would obtain, but a recent Pennsylvania appellate court case has addressed Pennsylvania law on fortuity questions. The case establishes an *objective* test for knowledge, not the *subjective* test the trial court employed.

In *Rohm & Haas Co. v. Continental Cas. Co.*, 732 A.2d 1236 (Pa. Super. Ct. 1999), the court noted first the known loss doctrine was a matter of first impression in Pennsylvania, and thus the court had to decide whether to construe it narrowly or broadly. *Id.* at 1256-57. After discussing other court's writings on the known loss doctrine, the court adopted the following rule:

> [W]e think that the appropriate standard for the "known loss" defense in Pennsylvania should not be knowledge of certainty of damages and liability, but whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should be, aware of a likely exposure to losses which would reach the level of coverage. It should not be necessary that the insured have [sic] already been met with a tabulation of losses sufficient to reach the excess coverage, as that would implicate a standard tantamount to criminal fraud. Rather, when a sophisticated insured, such as Rohm & Haas, is faced with mounting evidence that it will likely incur responsibilities to the extent of the insurance which is sought, the known loss defense should intervene. Otherwise, the issue is one not of insurance, but of pure indemnity.

*Id.* at 1258. The "charged with the knowledge" language imports an objective test into the fortuity question in Pennsylvania.

Thus, in light of these decisions on Pennsylvania law that postdated the trial court's decision here, we reverse the trial court and hold the burden of proof of lack of fortuity lies with the asserting parties, the DIC insurers. On remand, with respect to the trial court's Order Granting in Part and Denying in Part Defendants' Motion for Sum-

mary Judgment re: Mercury, PCBs, Cyanide, and Waste Management Units, filed March 8, 1996, the trial court should conform its order to apply Pennsylvania's law on fortuity as set forth in the *Rohm & Haas* case, unless that case is superseded by subsequent Pennsylvania law.[16]

## G. Allocation

The final issue we address in this case is the damages available to Alcoa upon a finding of coverage under the DIC policies. The jury found pollution damage to all three test sites occurred during the entire time the various DIC policies were in effect. The jury also found, however, pollution damage had occurred to portions of the three sites *prior* to the inception of insurance coverage. Because the pollution damage occurred both before and during the various policy periods, a question arose as to how to attribute the remediation costs of the pollution damage. The jury was unable to reach a verdict on whether there is a reasonable basis or bases to allocate to each separate policy year costs related to the property damage that occurred during that policy year.

At the conclusion of the trial, Alcoa filed a motion asking the trial court to hold as a matter of law the pollution damages were indivisible—that is, there was no way to distinguish between pollution damage occurring prior to policy inceptions and pollution damage occurring after policy inceptions. The trial court denied the motion, holding as a matter of law the pollution damage could be allocated on a pro rata, yearly basis. In its order denying the motion, the trial court prepared tables indicating the dollar amounts of the remediation costs the insurers were obligated to pay Alcoa. The trial court's allocation procedure drastically reduced the amount the insurers would have to pay Alcoa

---

[16]The Pennsylvania Supreme Court has accepted review of the *Rohm & Haas* case. The trial court on remand should abide further decisions on fortuity issues pending the decision of the Pennsylvania Supreme Court. To the extent the decision, analysis, or holdings of the Pennsylvania Supreme Court in *Rohm & Haas* contravene our holdings here with respect to our discussion of Pennsylvania law, any such decisions, analyses, and holdings shall prevail. Otherwise, this decision shall govern the proceedings on remand.

compared to the costs of remediation Alcoa actually incurred. For example, the Rod Mill Building at the Vancouver site required $4,048,661 to remediate. The jury found Alcoa had been causing pollution damage there for 32 years. Thus, the trial court divided 32 into $4,048,661 and held the insurers covering the Rod Mill Building had to pay Alcoa only $126,520.68 for each year a policy was in effect. All in all, Alcoa states the trial court's approach to the allocation issue resulted in a judgment of only $200,000 against its insurers, even though Alcoa spent in excess of $20,000,000 on remediation measures.

Missing from the trial court's analysis of this issue is a close examination of the applicable policy language. The insuring clause in the DIC policy states: "PERILS INSURED: This policy insures against all physical loss of, or damage to, the insured property as well as the interruption of business, except as hereinafter excluded or amended." Trial Ex. 9036, at 7-8. This language is very broad and contains no limitation as to time of the physical loss or damage to property. There is no exclusion in the policy for physical loss or damage that may have begun spreading before the policy inception.

The policy definition of occurrence likewise compels a broad reading of the policy: "The word 'occurrence' shall mean any one loss(es), disaster(s), or casualty(ies) arising out of one event or common causes(s)." *Id.* at 10. There are no words of limitation here. It seems clear from the policy language that any physical loss or damage manifesting itself during the time a DIC policy was in effect was covered by the policy, including pollution damage starting before the policy inception.

The trial court's written decision does not indicate why the court chose to allocate coverage on a pro rata basis rather than simply reading the policy as it is written and ordering full policy coverage for the damage Alcoa incurred.

In *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993), the Pennsylvania Supreme Court considered the issue of multiple insurance coverage

over time in the case of asbestos disease. France was an asbestos manufacturer and seller from 1956 to 1972. The wife of a person who had died from asbestos exposure to France's products that occurred between 1948 and 1978 sued France. France sought a defense and indemnification from its insurers for those years, but the insurers denied any duty to defend or indemnify France. France then filed a declaratory judgment action to force the insurers to defend and indemnify.

The six insurers at trial had provided policies at varying times and all the policies contained the same general liability language:

> "[The Insurer] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence, and [the Insurer] shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury."

*France*, 626 A.2d at 505 (alterations in original). One of the issues the trial court in that case considered was whether and how to allocate coverage among the six insurers. The trial court prorated the obligations of the insurers based on the time their respective policies were in effect (the *France* court did not explain the details of this proration). *Id.* at 506.

On appeal, the Pennsylvania Supreme Court rejected the proration approach:

> First, and most compelling, is the language of the policies themselves. Each insurer obligated itself to "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury to which this insurance applies." We have already ascertained that any stage of the development of a claimant's disease constitutes an injury "to which this insurance applies" under each policy in effect during any part of the development of the disease. Under any given policy, *the insurer contracted to pay all sums which the insured becomes legally obligated to pay, not merely some pro rata portion thereof.*

*Id.* at 507 (second emphasis added). Likewise, in the "perils

insured" clause of the DIC policies here, the insurers obligated themselves to insure "against all physical loss of, or damage to, the insured property," not merely to some prorated portion thereof.

▪ The trial court attempted to distinguish this case from *J.H. France* by describing the differences between asbestos disease and environmental contamination:

> Asbestos that has been inhaled may have no adverse effects for years and then may suddenly cause myriad physiological problems which are not necessarily related to the length of exposure or the number of asbestos fibers taken into the body. Asbestos disease is not merely a corollary of the volume ingested. Environmental contamination, on the other hand, is merely the sum of all its parts—each part per million of a particular contaminant that is discharged to the environment equally damages the insured property either by increasing the concentration of a particular area (if movement of the pollutant is retarded) or by increasing the size of the impacted area (if the pollutant readily migrates).

Clerk's Papers at 050077-78. It may be true, as the trial court stated, that the progression of pollution damage can be measured and apportioned more certainly year to year than can the progress of asbestos disease, but that understanding begs the question of whether the express DIC policy language compels proration. It is the policy language that determines the scope of coverage. The policy language here does not provide for any limitations to the scope of damage. *See also American Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 134 Wn.2d 413, 951 P.2d 250 (1998).

The insurers vigorously contend that while *J.H. France* may be correct as to third party coverage, it is not appropriately applied to first party coverage, citing the "all sums" language from the policy in *J.H. France*. We are not persuaded by this distinction. The language of the insuring agreement in the DIC policies is exceedingly broad, covering all physical loss or damage to Alcoa's property. This language is at least as broad as the policy language in *J.H. France*. Moreover, if DIC policies mean what the insurers

claim they mean, the policy language should reflect that meaning. The policies in this case do not, and we decline to write a proration of coverage into the policies when the insurers failed to do so themselves. The trial court erred in its decision to prorate coverage according to the years the various DIC policies were in force. We reverse the trial court on this issue and remand the case for further proceedings relating to Alcoa's judgment for insurance coverage.

## CONCLUSION

This case presents numerous complex factual and legal issues arising under Pennsylvania law. We both affirm and reverse the trial court, as noted above.

GUY, C.J., and SMITH, JOHNSON, MADSEN, ALEXANDER, SANDERS, IRELAND, and BRIDGE, JJ., concur.

After modification, further reconsideration denied November 1, 2000.