

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ANTHONY DICKERSON and JULIA
DICKERSON, husband and wife
and the marital community composed
thereof; J.D., a minor child, by and
through her Guardian Ad Litem,
ANTHONY DICKERSON; and THE
ESTATE OF JILLIAN ROSE
DICKERSON, by and through its
Administratrix, JULIA DICKERSON,

          Respondents,

      v.

C. SHAYNE MORA, M.D.,
BELLINGHAM OBSTETRIC &
GYNECOLOGIC ASSOCIATES,
P.S., a Washington corporation,

          Defendants,

PEACEHEALTH dba ST. JOSEPH
HOSPITAL, a Washington non-profit
corporation,

          Appellants.

No. 72059-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 16, 2015

LEACH, J. — In this professional negligence case, PeaceHealth appeals the trial court's order granting a new trial and imposing sanctions against it. After finding that PeaceHealth violated several orders in limine and that the cumulative effect of PeaceHealth's violations prejudiced the Dickersons, the trial court ordered a new trial and awarded sanctions to the Dickersons. Because of the

great deference we give to a trial court's decision to order a new trial and because the record supports the trial court's finding that PeaceHealth's violation of some orders in limine prejudiced the Dickersons in a manner that was not or could not have been cured by instructions, we affirm.

## FACTS

In September 2007, Julia Dickerson discovered that she was pregnant and began seeing Dr. C. Shayne Mora, an ob-gyn. A later ultrasound showed that she carried twins sharing a placenta but each with its own amniotic sac. This created a risk for twin-to-twin transfusion syndrome (TTTS), where only one twin receives adequate nutrients. Her condition required monitoring. Dr. Mora referred Julia to perinatologist Dr. Calla Michelle Holmgren, who recommended biweekly ultrasounds.

In December, Julia reported increasing discomfort. And on February 6, 2008, she visited Dr. Mora's office because she had experienced three days of chest and back pain. Staff at his office checked her vital signs, recorded her pulse, and detected positive heart tones or movement for both twins. Dr. Mora directed Julia to go to PeaceHealth for further evaluation, provided its childbirth center with Julia's background, and ordered tests, including a pulse oximetry and a nonstress test.

The same day, at PeaceHealth, Nurse Susan Wahl evaluated and monitored Julia. Guidelines required that care providers "[i]nitiate electronic fetal monitoring (obtain ≥20 minute strip)" for all obstetrics patients. At 11:10 a.m., Nurse Wahl used electronic fetal monitoring to get Baby A's heart rate of 136 but detected only fetal movement for Baby B. At 11:40 a.m., another nurse was unable to get a continuous heart rate strip. Nurse Wahl told Dr. Mora that neither nurse could get a continuous heart rate strip for Baby A or any fetal heart tones for Baby B. The nurses recorded a total of six minutes of heartbeats from Baby A and did not record any of Baby B's heartbeats. At 11:50 a.m., Nurse Wahl measured fetal heart rates with a Doppler of 140 for both babies. Dr. Mora saw Julia and verbally discharged her at 12:20 p.m. Julia left the appointment upset. She believed something was wrong but understood that the clean bill of health she received from Dr. Mora prevented her from immediately seeing Dr. Holmgren at the University of Washington. She asked Dr. Mora's office to move up her appointment with Dr. Holmgren.

On February 12, Julia went to that appointment at the University of Washington. There, an ultrasound revealed stage three TTTS, with Twin A showing a lack of amniotic fluid and a more than three-week growth lag and Twin B showing excess amniotic fluid. Dr. Holmgren removed a liter of fluid from Twin B's amniotic sac. The next morning, Twin A showed signs of heart rate

deceleration. Because of the threat to the twins' lives, Dr. Holmgren decided to perform a caesarean section. One twin, J.D., weighed 560 grams at birth, while the other, Jillian, weighed 860 grams. Jillian died nine days later. In July 2008, J.D. went home with a tracheotomy tube but required in-home nursing care. One day Julia found J.D. in acute distress after the nurse providing in-home care had accidently dislodged the tracheotomy tube and then left J.D. Julia called 911. J.D. remained in the hospital for a month and since that episode has undergone over 20 surgeries. She has disabilities that will affect her future.

The Dickersons filed a lawsuit against the nurse providing home care and her employer, Alliance. They later settled for $2.78 million. They also filed a lawsuit against Dr. Mora and PeaceHealth, settling with Dr. Mora for $1 million.

The case against PeaceHealth went to trial. The Dickersons claimed that Nurse Wahl and PeaceHealth failed to provide proper care to Julia on February 6 when Nurse Wahl had an order for a nonstress test but failed to obtain 20 minutes of fetal monitoring and, after failing to do so, did not advocate for an ultrasound. The trial court entered several orders in limine relating to the trial. A jury found for PeaceHealth. The Dickersons moved for a new trial and for monetary sanctions or a judgment notwithstanding the verdict, alleging that PeaceHealth violated several of the orders in limine.

On June 10, 2014, the trial court granted the motion for new trial, concluding that the cumulative effect of PeaceHealth's violations required a new trial. The court also imposed monetary sanctions totaling $105,306.34. It denied the Dickersons' motion for judgment notwithstanding the verdict. PeaceHealth appeals.

## STANDARD OF REVIEW

This court reviews a trial court's order granting a new trial for abuse of discretion.[1] We reverse only if a trial court makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons.[2] When reviewing for abuse of discretion, we look to see if a party engendered a feeling of prejudice in the minds of the jury so that the other party did not receive a fair trial.[3] To set aside an order granting a new trial, "[w]e require a much stronger showing of abuse of discretion" than an order denying a motion for new trial.[4]

## ANALYSIS

PeaceHealth claims that the trial court's failure to comply with CR 59(f) limits the scope of our review to two matters, neither of which justify a new trial or

---

[1] Smith v. Orthopedics Int'l, Ltd., 170 Wn.2d 659, 664, 244 P.3d 939 (2010); Teter v. Deck, 174 Wn.2d 207, 222, 274 P.3d 336 (2012).
[2] Teter, 174 Wn.2d at 222.
[3] Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000) (Alcoa) (quoting Moore v. Smith, 89 Wn.2d 932, 942, 578 P.2d 26 (1978)).
[4] Teter, 174 Wn.2d at 215.

the imposition of sanctions. Alternatively, PeaceHealth claims that none of the other claims of misconduct, either individually or collectively, justify the trial court's decision.

CR 59(f) provides,

**Statement of Reasons.** In all cases where the trial court grants a motion for a new trial, it shall, in the order granting the motion, state whether the order is based upon the record or upon facts and circumstances outside the record that cannot be made a part thereof. If the order is based upon the record, the court shall give definite reasons of law and facts for its order. If the order is based upon matters outside the record, the court shall state the facts and circumstances upon which it relied.

An order granting a new trial must state the trial court's reasons in sufficient detail "to enable review 'without resort to debatable inference and speculation.'"[5] An order complying with the rule provides the reviewing court with the basis for the trial court's order.[6] Here, the trial court's order stated no reasons but incorporated an attached supplemental statement and findings of the court (collectively the order), which concluded that PeaceHealth failed to comply with several orders in limine and that "the cumulative effect of these violations was to deprive the plaintiff a chance at a fair trial." It commented on two matters the court found "most striking"—Dr. Mora's testimony about Nurse Wahl and

---

[5] Dybdahl v. Genesco, Inc., 42 Wn. App. 486, 488, 713 P.2d 113 (1986) (quoting Williams & Mauseth Ins. Brokers, Inc. v. Chapple, 11 Wn. App. 623, 628, 524 P.2d 431 (1974)).

[6] Bensen v. S. Kitsap Sch. Dist. No. 402, 63 Wn.2d 192, 196, 386 P.2d 137 (1963).

PeaceHealth's arguments about damages in closing—and expressly accepted the Dickersons' analysis and summary of the probable jury impact of alleged violations described in the Dickersons' motion for new trial.

PeaceHealth argues that because the trial court complied with CR 59(f) for only two issues, this court may review only those two issues as justification for the trial court's decision. But even where an order fails to comply with CR 59(f), Washington courts have looked outside the order to a trial court's oral opinion.[7] Because the trial court stated the basis for its decision in the attachment and agreed without exception with the plaintiffs' motion for a new trial, we have adequate information to review the basis for the trial court's decision "without resort to debatable inference and speculation." Thus, we reject PeaceHealth's argument about the scope of our review.

PeaceHealth asserts that the trial court abused its discretion both when it concluded that PeaceHealth violated the orders in limine and that the cumulative effect of the violations warrants a new trial. A trial court may grant a new trial where a trial counsel's conduct constitutes prejudicial misconduct and not mere aggressive advocacy in the context of the entire record, the movant properly objected to the misconduct, and the trial court's instructions did not cure the

_____

[7] Knecht v. Marzano, 65 Wn.2d 290, 292, 396 P.2d 782 (1964); Spratt v. Davidson, 1 Wn. App. 523, 526, 463 P.2d 179 (1969); Gestson v. Scott, 116 Wn. App. 616, 620, 67 P.3d 496 (2003).

misconduct's prejudice.[8]  Here, we review individually the six order in limine violations alleged by the Dickersons and accepted by the trial court and if the cumulative effect of any violations resulted in incurable prejudice to the Dickersons.  We give the trial court's order great deference and will not find an abuse of discretion where the record supports the order.

PeaceHealth first contests the trial court's conclusion that Dr. Mora's testimony violated an order in limine prohibiting testimony that Nurse Wahl was a good, careful, safe, or conscientious person.

At trial, the Dickersons' counsel read portions of Dr. Mora's deposition to the jury, where Dr. Mora was asked if he trusts Nurse Wahl and he answered, "Absolutely."  PeaceHealth then argued that this opened the door and requested permission to ask Dr. Mora during direct examination why he trusted Nurse Wahl.  Because the trial court expressed concern that Dr. Mora's answer could violate an order in limine, PeaceHealth presented Dr. Mora's testimony to the trial court outside the presence of the jury.  PeaceHealth asked him, "Why do you trust [Nurse] Wahl?"  In Dr. Mora's answer, he said that Nurse Wahl was "one of the most reliable nurses that we have in labor and delivery."  The Dickersons objected, arguing that "whether or not [Dr. Mora] believes [Nurse Wahl is] reliable is not admissible.  He can say, I trusted her because I worked side by side with

_____

[8] A.C. v. Bellingham Sch. Dist., 125 Wn. App. 511, 521, 105 P.3d 400 (2004); Alcoa, 140 Wn.2d at 539-40.

her for 15, 16 years." The trial court responded, "I think going beyond that gets into the area that it would be specifically covered by the order in limine."

PeaceHealth explained the order in limine to Dr. Mora, and he responded,

[M]y intent is to come here and speak the truth and the truth is as I just spoke, that—and I don't want to violate any orders, but if you're going to ask me about my experience with this specific nurse and a recollection of an event that occurred eight years ago, it's going to be difficult for me to separate my relationship with her, my dependence upon her as a trustworthy nurse, a professional, that's part of what makes me confident in my interaction that occurred on that day.

When Dr. Mora asked if the order in limine permitted this, the trial court confirmed, "That's fine. I think that sounded fine to me."

When PeaceHealth asked Dr. Mora in front of the jury, "Why did you trust [Nurse] Wahl?" Dr. Mora testified, "At that time I probably would have worked with her side by side for approximately 10 years. Her—she is a nurse whom I trust and I have an excellent rapport with and her experience is vast and her reliability is excellent."

The Dickersons objected and asked for sanctions. At the trial court's suggestion, they submitted briefing supporting an instruction telling the jury that it must judge Nurse Wahl solely on the medical care she provided and that it must disregard evidence of her character or a character trait offered to prove she conformed to that character or character trait. At the end of trial, the court instructed the jury, "The conduct of PeaceHealth and Nurse Wahl on February 6,

2008, must be judged based solely upon the medical care and services she or PeaceHealth provided that day." The order for new trial supplemental statement summarized Dr. Mora's challenged testimony and concluded that it violated the order in limine.

PeaceHealth contends that the Dickersons opened the door to the testimony and that the trial court approved the answer Dr. Mora ultimately gave. And it asserts that the word "reliability" does not materially differ from the word "trustworthy," approved by the trial court. PeaceHealth finally argues that even if the testimony violated the order in limine, the trial court remedied any prejudice with its jury instruction.

But the trial court specifically excluded testimony that Nurse Wahl was a reliable nurse, concluding before Dr. Mora testified in front of the jury that this description violated the order in limine prohibiting evidence that Nurse Wahl was a good, careful, safe, or conscientious nurse. Though the Dickersons themselves introduced evidence that Dr. Mora trusted Nurse Wahl and the trial court approved Dr. Mora's testimony that he depended on her as a trustworthy nurse, in context that statement reflects Dr. Mora's experience and professional relationship with Nurse Wahl as one containing trust. This differs from Dr. Mora's challenged testimony describing Nurse Wahl as reliable, testimony specifically prohibited by the trial court.

While improper, a violation of an order in limine does not warrant a new trial when the violation does not prejudice the jury.[9] In <u>Aluminum Co. of America v. Aetna Casualty & Surety Co.</u>,[10] the Supreme Court found that a trial court did not abuse its discretion when it denied a motion for new trial. The court agreed with the trial court's conclusion that counsel's violation of an order in limine prohibiting comment about the legal effect of misrepresentation to an insurance company was improper conduct, but that the comment did not result in prejudice.[11] The trial court relied on the fact that the subject of the order in limine was only one basis of the insurance company's argument, and the jury could have learned the same information by properly reading the insurance contract before it.[12]

But here, Dr. Mora testified about Nurse Wahl's character as a reliable nurse, a subject specifically prohibited and directly related to the jury's determination of a central issue in the case: did Nurse Wahl violate the standard of care when treating Julia? Thus, in this case, a judge could conclude that this violation of an order in limine prejudiced the jury.

PeaceHealth also claims that it could not be blamed for Dr. Mora's answer because another order in limine prohibited it from talking directly to Dr. Mora

---

[9] See <u>Alcoa</u>, 140 Wn.2d at 540-41.
[10] 140 Wn.2d 517, 541, 998 P.2d 856 (2000) (<u>Alcoa</u>).
[11] <u>Alcoa</u>, 140 Wn.2d at 540.
[12] <u>Alcoa</u>, 140 Wn.2d at 540.

before he arrived in court. But when PeaceHealth brought this circumstance to the court's attention during the hearing, the trial judge responded, "We can talk—you can talk to him directly now." The approved testimony answered PeaceHealth's question asking if he thought he could comply with the court's order. But PeaceHealth's question to Dr. Mora before the trial court, "Why do you trust [Nurse] Wahl?" triggered Dr. Mora's prohibited response, that Nurse Wahl was reliable. And when PeaceHealth's counsel asked Dr. Mora a similar question in front of the jury, why Dr. Mora trusted Nurse Wahl, the question elicited the same prohibited testimony, that Nurse Wahl's "reliability is excellent." Thus, we conclude that PeaceHealth cannot claim that the prohibition on ex parte communication shielded it from responsibility for Dr. Mora's testimony.

Often, an instruction to the jury may cure any improper testimony.[13] While we generally assume that a jury follows the trial court's instructions, the trial court concluded in its order granting new trial that the cumulative effect of the multiple violations of the orders in limine exposed the jury to prejudice that "caused far more damage than could reasonably or reliably be expected to be remedied by curative instructions, no matter how many and no matter how often they were given." Because we afford the trial court's conclusion great deference and the record supports this conclusion, the trial court did not abuse its discretion.

---

[13]Alcoa, 140 Wn.2d at 538.

PeaceHealth next contends that the trial court abused its discretion when it based its order for new trial and sanctions in part on defense counsel's statements during closing argument. Counsel said, "The first thing is we are talking real dollars. Big numbers are thrown around, um, thinking in your own life how long it takes to save money." Counsel then stated, "Really in the context of this case because we know what happened with the other litigation, [defense counsel] is the one that told you about the settlement. What he is really saying is no, no more. No, no more." The Dickersons objected to the first comment but not the second. The trial court overruled the objection. But the trial court later concluded in its order that the "how long it takes to save money" comment violated the order in limine prohibiting counsel from arguing the golden rule, where counsel impermissibly asks the jury to put itself in the position of the defendant.[14] The trial court also concluded that PeaceHealth's "no, no more" comment improperly told the jury that the plaintiffs had already been fully compensated, suggesting a violation of the order in limine prohibiting argument comparing the Dickersons' request for compensation with a windfall.

PeaceHealth asserts that its comments during closing argument were not a golden rule argument. It disagrees with the trial court's analysis and

---

[14] A.C., 125 Wn. App. at 523.

distinguishing of <u>A.C. v. Bellingham School District</u>,[15] where this court affirmed a trial court order denying new trial. Defense counsel in <u>A.C.</u> argued,

> "And think about really what it boils down to is what's the value of a dollar. What do you have to go through to get your dollars? What do they mean to you when you have them? Think about what it means to you. The number that I want to give you for all of the damages in the case is half of a year of an average worker's pay. If you think that's fifteen thousand or twenty thousand, that's an appropriate number. That's a lot that you go through. If you had that amount of money, what would it mean to you? Would it be a lot of money to you? That's an issue for the jury to decide."[16]

The <u>A.C.</u> court concluded that defense counsel's closing argument did not constitute an improper golden rule argument because the defendant did not ask members of the jury to put themselves in the defendant's position to decide if jury members would want to be found guilty of negligence.[17] Instead, counsel told the jury to determine what amount of money would properly compensate A.C. and what that money means to them.[18]

> Here, the trial court in its order granting new trial distinguished <u>A.C.</u>:

> Unlike the comments in <u>A.C.</u> . . ., [in this case] the focus was <u>not</u> on the jury or on the jury evaluating how what amount of money would fairly compensate the plaintiff or on what receipt of that money would mean to them (the jury), but rather focused on emphasizing the need to award no money whatsoever, . . . this Court believes that the only logical inference based upon defense counsel's actual words and inflection was to ask the jury to consider how much these "real dollars" would impact the jury if the jurors were in the

---

[15] 125 Wn. App. 511, 515, 105 P.3d 400 (2004).
[16] <u>A.C.</u>, 125 Wn. App. at 524.
[17] <u>A.C.</u>, 125 Wn. App. at 524.
[18] <u>A.C.</u>, 125 Wn. App. at 524.

position of the defendants and required to pay it out of their own pockets (by asking them to consider "how long it takes to save money").

PeaceHealth claims that counsel's comment responded to the Dickersons' counsel's discussion of money during its closing argument and that the comment merely amounted to permissible aggressive advocacy. The Dickersons' counsel in closing stated, "I told you at the beginning of this case I was going to ask you for more money than PeaceHealth could possibly imagine" and that "[t]he money adds up fast" when discussing the evidence in support of the $36 million in damages the Dickersons asked for. PeaceHealth responded, arguing that while it did not expect the jury to reach the question of damages, it would address money because the Dickersons had.

But, as the trial court observed, unlike counsel in A.C., PeaceHealth's counsel suggested that the large dollar amount the Dickersons asked for was a lot of money—"big numbers"— that the members of the jury would not want to pay if they had been asked to, "thinking . . . how long it takes to save money." This comment did not focus on the jury finding no negligence and therefore awarding a zero dollar amount. Rather, it asked the jury to find PeaceHealth not liable or not award the amount the Dickersons requested because members of the jury would not want to pay that amount, taking into consideration "how long it takes to save money." And because we defer to the trial court's understanding of what occurred at trial, including that "the only logical inference based upon

defense counsel's actual words and inflection" was that this violated its order, we conclude that PeaceHealth's argument constituted prejudicial misconduct. Because the Dickersons objected and the trial court failed to offer an instruction, we further conclude that the trial court did not abuse its discretion when it based its order for new trial in part on these grounds.

PeaceHealth claims that it did not violate the order in limine prohibiting argument that the Dickersons' receipt of damages would amount to a windfall. The trial court concluded that the "no, no more" comment described "'no more money,'" clearly suggesting that plaintiffs had already been adequately and fully compensated financially and further suggesting that the "plaintiff's receipt of money has to stop 'here and now', as it were."

As PeaceHealth contends, the evidence allowed it to argue[19] that the jury should find no negligence, and for that reason the jury should not award the Dickersons any money. Had counsel only argued "no compensation" because no negligence occurred, he would not have violated the order in limine prohibiting windfall arguments. But counsel's strong assertion "no more" suggested to the jury that the Dickersons should receive no award because they had recovered enough money already. Given the strong deference we afford the trial court, the

---

[19] See Christensen v. Munsen, 123 Wn.2d 234, 243, 867 P.2d 626 (1994).

record supports its conclusion that the "no, no more" comment violated the order in limine preventing windfall arguments.

The Dickersons did not object to this part of PeaceHealth's closing argument. But the trial court concluded that the violations caused "far more damage than could reasonably or reliably be expected to be remedied by curative instructions." We rely on the strong deference we afford a trial court in this matter to conclude that the record supports its conclusion that the comment was so flagrant and prejudicial that no instruction could have cured any misconduct.[20] We thus conclude that the trial court did not abuse its discretion by relying on counsel's "no, no more" comment.

PeaceHealth argues that the Dickersons' closing argument provides context for PeaceHealth's comments. First, the Dickersons' counsel stated that they were not suing Dr. Mora, Nurse Wencek,[21] or Alliance because they had "accepted . . . responsibility." PeaceHealth argues that this claim implies that Nurse Wahl and PeaceHealth were "bad." Also, PeaceHealth argues that the Dickersons argued a "lack of caring" on the part of Nurse Wahl, also in violation of the order in limine. But when read in full, the Dickersons pointed the jury to the policies requiring different actions than those Nurse Wahl took, arguing that

---

[20] See A.C., 125 Wn. App. at 525.
[21] Nurse Wencek provided in-home nursing care for J.D. and was an employee of Alliance.

Nurse Wahl's testimony that she would not have done anything differently was either wrong or demonstrated that "nobody cares." This does not contextualize or excuse PeaceHealth's improper arguments in violation of the orders in limine.

PeaceHealth also argues that its comments in closing could not have prejudiced the jury when the jury never reached the issue of damages in its verdict. But this assumes that the arguments clearly separated the issue of damages from the issue of negligence. Because PeaceHealth's counsel inappropriately suggested that the issue of damages rather than a determination of negligence should drive the jury's decision, its argument fails.

PeaceHealth argues that it did not violate the court's orders in limine prohibiting argument suggesting that the Dickersons were at fault or should have conducted their own research.

PeaceHealth stated in its opening statement,

> So what happened after Ms. Dickerson left the hospital? Well, there's no contact with Dr. Mora for that six days, until she went to U-Dub. No contact with St. Joseph's; didn't come into the hospital at all for any reason.
> And then on February 12, Ms. Dickerson has this, what Dr. Holmgren described in her note, as a regularly scheduled check-up.

The Dickersons objected after PeaceHealth finished its opening. The trial court instructed the jury, "I will remind you that the Court has previously entered an order declaring that none of the Dickersons were at fault in any way for any health care negligence or any damages sought by the Dickersons in this matter."

After this instruction and during Julia's testimony, juror 10 submitted two questions to the bailiff, which the Dickersons' counsel read aloud to the trial court but not the jury: "how does a clean bill of health prevent you from seeking medical help elsewhere or, underlined three times, how did it prevent you, underlined three times, from getting extra help, question mark." At the end of trial, the court gave jurors instructions 23 and 24, reminding them that the Dickersons did not engage in contributory negligence and that they must ignore any suggestion that the Dickersons were at fault in any way.

PeaceHealth asserts that counsel's comment did not attribute fault to Julia but simply explained to the jury why PeaceHealth had no further involvement in Julia's care. But counsel told the jury that after Julia failed to contact her health providers for six days, she moved up her appointment and came in to her scheduled appointment uncomfortable, not sleeping, and with shortness of breath. Thus, the context of the comment reveals that PeaceHealth's opening statements focused on Julia's actions and not PeaceHealth's involvement in her care. And because we defer to the trial court's assessment that its instructions to the jury failed to remedy the prejudice from the misconduct, we conclude that the trial court's instruction to the jury after opening statements along with instructions 23 and 24 failed to adequately cure the harm.

PeaceHealth contends that its expert witness Nurse Michelle Murray did not testify that the Dickersons' expert witness Nurse McGrath lied in violation of the order on motion in limine 7. Nurse McGrath provided expert testimony for the Dickersons that Nurse Wahl failed to adhere to the standard of care and follow necessary hospital policies. But Nurse Murray testified differently, asserting that Nurse Wahl did meet the standard of care and that her noncompliance with certain hospital policies did not affect Nurse Murray's assessment of Nurse Wahl in this case. Outside the presence of the jury, the Dickersons objected to Nurse Murray's testimony, arguing that PeaceHealth "[brought] this witness to criticize my witness, in other words to imply that she is lying." The trial court acknowledged the objection.

The jury alone determines a witness's credibility.[22] Thus, as reflected in an order in limine, one expert witness may not offer an opinion about another witness's veracity.[23] But an expert witness may controvert another witness's expert opinion. And when expert witnesses disagree, the jury decides the disputed issues of fact or opinion.[24] Here, counsel presented Nurse McGrath's

---

[22] Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).
[23] ER 608; State v. Fitzgerald, 39 Wn. App. 652, 657, 694 P.2d 1117 (1985).
[24] See Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 119-20, 11 P.3d 726 (2000) (When testimony of two or more expert witnesses conflict, a disputed issue of fact exists, and a trial court does not properly grant summary judgment.).

criticisms of Nurse Wahl to Nurse Murray and asked Nurse Murray to agree or disagree with Nurse McGrath's assessment. Indeed, Nurse Murray answered in these terms, saying, "I can't agree with that" and pointing to what she viewed as lack of evidence to support her opinion that Nurse Wahl met the standard of care. Because Nurse Murray stated an opinion disagreeing with Nurse McGrath and did not suggest that Nurse McGrath lied or question her credibility, PeaceHealth did not violate the order in limine, and the trial court abused its discretion when it decided it did.

PeaceHealth also claims that it did not violate any order in limine when Nurse Murray testified about hospital policies. During argument on the request for the implicated order, the trial court observed it prohibited testimony that "PeaceHealth safety policies and procedures were entirely inapplicable." Nurse Murray testified that hospital policies requiring a 20-minute strip were relevant to treatment where a patient was in labor and thus did not apply to Julia, who was not in labor. But Nurse Murray also testified that Nurse Wahl successfully identified patient risk factors, therefore complying with that policy. Thus, PeaceHealth did not elicit testimony that the policies did not apply at all. Rather, Nurse Murray explained those policies and how they applied in this case. Thus, PeaceHealth did not violate any order in limine with Nurse Murray's testimony. The trial court abused its discretion by deciding it did.

In the Dickersons' response brief, they argue that PeaceHealth violated the order in limine prohibiting testimony that Julia was not an obstetrics patient or that she sought care for any other reason than her concern for the health of her twins. While the Dickersons' motion for new trial touches these prohibitions, its argument did not. The trial court thus could not have based its order for new trial on these alleged violations, and we decline to consider them.

We have decided that the record supports only four of the six violations found by the trial court. However, the record makes clear that the trial court would have found these four violations sufficient to order a new trial and impose sanctions. Thus, we do not remand this matter to the trial court to confirm what it has already communicated. And those four violations adequately support the trial court's decision to order a new trial.

PeaceHealth finally argues that the trial court had no basis to impose sanctions where the evidence does not support the court's conclusion that PeaceHealth violated the orders in limine. This court reviews a trial court's decision to impose sanctions for abuse of discretion and affords it wide latitude in its determination of which sanctions are appropriate.[25] Because the record supports the conclusion that PeaceHealth violated several orders in limine and

---

[25] Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 355, 858 P.2d 1054 (1993).

the trial court imposed sanctions on that basis, the trial court did not abuse its discretion, and sanctions were proper.

## CONCLUSION

Because we cannot be in the courtroom to appreciate how violations of orders in limine affected the jury, we defer to the trial court's assessment of the impact those violations had. Because the record sufficiently supports the trial court's determination that PeaceHealth violated several of the orders in limine and because the trial court determined that any instruction given would not remedy these violations, the trial court did not abuse its discretion when it ordered a new trial and imposed sanctions. We affirm.

Leach, J.

WE CONCUR: