
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ALEX AND KATY THOMASON, husband and wife, and their minor children, | ) ) ) ) | No. 37037-2-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| DONNA STENNES and MICHAEL STENNES, | ) ) ) | |
| Respondents. | ) ) | |

SIDDOWAY, J. — Alexander and Katy Thomason appeal the trial court's order

granting a new hearing on the Thomasons' motion for contempt on the basis of newly

discovered evidence. We affirm.

FACTS AND PROCEDURAL BACKGROUND

In September 2018, Alex and Katy Thomason sought a civil anti-harassment order

in Okanogan County Superior Court against their neighbors, Mike and Donna Stennes,

complaining of actions by the Stenneses dating as far back as the summer of 2016. The

Thomasons asked that an order of protection be entered that restrained contact, prohibited

surveillance, excluded the Stenneses from the Thomasons' and their young children's residence, real property, workplace, school, and daycare, and prohibited them from calling or signaling the Thomasons' dogs away from their property.

At the time, Mike and Donna[1] had adverse interests to Alex Thomason in Chelan County probate proceedings over the estates of Mike's mother, Evelyn Stennes, who died in January 2009, and his father, Bert Stennes, who died in August 2017. The personal representative (PR) for both estates had been Cody Gunn, Mr. Thomason's brother-in-law, until Mr. Gunn resigned in the summer of 2018 and the court, perceiving potential conflicts between the estates, appointed separate PRs. Mike Stennes and the newly-appointed PR for Evelyn's estate took the position that Mr. Thomason, who had befriended Bert and served as his lawyer beginning in or about 2012, had financially abused Bert by taking over $600,000 from his client when Bert was between the ages of 85 and 93.

The Seattle lawyer who represented Mike in the probate proceedings appeared for the Stenneses in the Okanogan proceeding, and at a hearing in October the Stenneses stipulated to entry of the order requested by the Thomasons. Their lawyer explained that the Stenneses denied all allegations of harassment but would accede to the restraints

---

[1] Several Stennes family members are discussed in the opinion, so for clarity, we sometimes refer to them by their first names, intending no disrespect. When we refer to "the Stenneses," it is always to Mike and Donna, as the defendants below and respondents on appeal.

requested by the Thomasons "to avoid what we regard as the further inflammation among neighbors that happens in these kinds of hearings." Report of Proceedings (RP) at 11. The court did not make findings of harassment, but relying on the stipulation entered a protection order. The order granted the restraints requested in the Thomasons' petition with a modification that the Stenneses could enter the Pateros school but could not remain if the Thomasons were present.

The following April, the Thomasons filed a motion for contempt and asked the court to expand the order's scope, alleging violations of the order by the Stenneses. They also sought an order requiring the Stenneses to surrender firearms. At a hearing held on May 16, the trial court heard live testimony from the Thomsasons, the Stenneses, and a sheriff's officer who had responded in April to a complaint from Ms. Thomason. The Thomasons testified that the Stenneses had violated the protection order in numerous ways.

The Stenneses denied violating the order and offered evidence of a motive on the part of the Thomasons to falsely accuse them of harassment. Bert Stennes's last will and testament, executed in November 2016, had treated Alex Thomason very favorably.[2] It

---

[2] At XI.B, Bert Stennes's will provides:

It is my further intent that my attorney, friend and neighbor, ALEX THOMASON, be released from any and all business transactions with me and my estate including, but not limited to, any contractual and business obligations to me and my estate upon my death, and that he be fully

also included an unusual provision under which Mike and Donna believed Alex Thomason could acquire the riverfront home, formerly owned by Mike's parents, in which Mike and Donna live. The will distributed most of Bert's assets, including the riverfront home, to a Stennes Family Trust. The will further provided:

> In the event that one or rnore of my children resides at any real property owned by me at the time of my death, it is my intent and wish that my Trustee allocate such property in trust to the share of such child, and that such child be permitted to continue to live at such property for as long as he or she wishes without payment of monthly rent; **provided, such child, and any family of such child, that occupies any such property shall at all times be on their best behavior and abstain from any action or activity that, in the sole discretion of my Trustee, constitutes harassment of one or more adjoining landowners.**

Clerk's Papers at 95 (emphasis added and omitted). Finally, the will provided that "my attorney, ALEX THOMASON, shall have the right, without court proceedings, to remove any Trustee named hereunder and to appoint one or more successor Trustees." CP at 101.

Mike offered unrebutted testimony that both Mr. Gunn and the successor PR for Bert's estate were friends of Mr. Thomason. He also testified that Mr. Thomason had

---

> protected from any claims regarding our joint business transactions. I view Alex Thomason as my spiritual son and expect all of my heirs and beneficiaries to treat him as such and not bring any claim or complaint against him or his family. I entered into agreements with Alex Thomason as part of my ministry and with the faith Alex will further promote our joint goal of advancing the Christian Gospel message.

Clerk's Papers (CP) at 94-95.

commented to him that the Stennes riverfront home "[is] the most beautiful property on the Columbia" and he would "love to have a place like that." RP at 192. While litigation had delayed the funding of the Stennes Family Trust created by Bert's will, Mike and Donna believed the PR could evict them, citing a will provision granting the PR all "management and distributive powers and discretions provided by this Will and by law to my Trustee." CP at 101.

Toward the end of the hearing on the Thomasons' contempt motion, and before announcing its findings, the trial court said it was troubled by Mr. Thomason's involvement with the will:

> [THE COURT:] Mr. Thomason, this has all compounded. It is all complicated by the fact that you are mentioned prominently in Mr. Stennes's father's Will. You were his attorney and the provision that talks about the trustee or arguably, the personal representative having potentially the authority to—to remove the Stenneses if they believe in their sole discretion that they're not acting on their best behavior at all times. That's a lot of power and it creates, and you have to agree as an attorney, you have to agree that it creates a question. I've known you for a long, long time. I've always found you to be honest and forthright with the Court. Now, when we're talking about family and their—their protection and so forth, I think there's a legitimate question just based on the appearances.

RP at 273.

The court nonetheless granted the Thomasons some relief. It denied their motion for a surrender of weapons by the Stenneses. Moving on to the alleged contempt, the court commented that there was "little direct evidence of violations," but it found that Mr. Thomason's testimony was direct evidence of one violation (that Mike had called

5

him a "goofball") and that the Thomasons had presented circumstantial evidence of several other violations. RP at 280.

The Thomasons' lawyer was directed to prepare an order, which he did, noting the order for presentment on June 20. The Stenneses' lawyer made arrangements with court staff to call her for a telephonic appearance at the presentment hearing. At the time of the hearing, the court was unaware of these arrangements and, after delaying the hearing and unsuccessfully trying to reach the Stenneses' lawyer at her office number (*not* the number at which she told court staff she could be reached), the trial court entered an order finding the Stenneses in contempt. The order made the following findings of contempt:

> 8. Testimony at the hearing established by a preponderance of the evidence that the Respondents contacted the Petitioners by (1) calling Mr. Thomason a "goofball" through the fence between the properties; (2) discharging weapons; and (3) playing loud music on Easter Sunday.

> 9. Testimony at the hearing established by a preponderance of the evidence that the Respondents Surveilled the Petitioners. The Court finds that there were too many unusual events that occurred while the Petitioners happened to be outside for these events to be coincidence. The Court finds by a preponderance of the evidence that these events demonstrate that the Respondents were surveilling the Petitioners.

CP at 516. The trial court also denied a motion for a new hearing that the Stenneses had filed in early June. The Stenneses' lawyer would later point out that she had filed it protectively and had not noted it for hearing on June 20.

A little over a week later, the Stenneses filed a "Second Motion for New Hearing and Motion for Reconsideration." CP at 418. It renewed the arguments in their earlier motion and added a new ground, CR 59(a)(4), alleging the discovery of new evidence. The new evidence was handwritten notes from the files of Speidel Bentsen, LLP, the law firm that represented the PR for Bert's estate in the Chelan County probate proceedings. The notes were produced in discovery ordered by the Chelan County Superior Court the day after the May 16 hearing on the Thomasons' contempt motion. The court had ordered production to Mike of all attorney-client materials prepared by Bert's attorneys and the attorneys for his estate's PRs. The records were received by Mike's lawyer on June 10.

The Stenneses argued that handwritten notes apparently taken by Mr. Speidel or Mr. Bentsen reflected a telephone conversation on January 23, 2019, in which it appears Mr. Thomason told Mr. Speidel and/or Mr. Bentsen:

CP at 584, construed by the Stenneses as "*I need Mike [Stennes] to be [a] [beneficiary] so I can evict him.*" Br. of Resp't at 16 (emphasis added). They allege that other handwritten notes of a conversation the Thomasons' Okanogan lawyer had with Mr. Speidel and/or Mr. Bentsen reveal that the Thomasons planned to bring a motion for

7

contempt but were concerned about its timing.  The notes produced by the law firm state, in part:



CP at 594, construed by the Stenneses as "*Don't believe properties moved into trust  1. Is the harassment claim ripe?  2. Does existing harassment order result in eviction.*"  Br. of Resp't at 16 (emphasis added).  Other entries suggesting a motivation by the Thomasons to advance claims of harassment to obtain the Stenneses' eviction from the riverfront home were also identified by the Stenneses' counsel.

In moving for a new hearing and reconsideration the Stenneses argued that previously their belief that Alex Thomason was trying to have them evicted "could only be presented as Mike's theory . . . and Thomason could deny it without further contradiction," whereas "[t]he statements made by Thomason to Speidel Bentsen, and by Mr. Chase to Speidel Bentsen, can now be offered as proof of Thomason's lack of credibility and real motivations."  CP at 429.

At the hearing on the motion for a new hearing and reconsideration, the trial court began by apologizing to the Stenneses' lawyer for the failure to honor her request to participate telephonically in the June 20 hearing.  Commenting on the fact that court staff

had not called the right telephone number, the court observed "this is where the Court's shortcoming in its process failed everyone." RP at 329-30. After further introductory comments outlining the several issues to be resolved at the hearing, the trial court asked, rhetorically, whether the Stenneses' motion was "a motion for a new trial, [or] is it a motion for reconsideration?" RP at 333. It answered its own question, saying, "I don't want to get wrapped up in technicalities. The point is, there's a request for a new—a new hearing." *Id.*

The trial court addressed other issues raised by the Stenneses' motion before turning to their newly discovered evidence argument under CR 59(a)(4). The Stenneses characterized the newly discovered attorney notes as "devastating" given "how close this case was." RP at 366. The Thomasons argued the new evidence was not new because the theory that Alex Thomason was trying to evict the Stenneses had been advanced all along. They also argued the new evidence was not material and the case had not been close.

The trial court granted the Stenneses' motion. In orally ruling, it characterized the attorney notes as "troubling." RP at 382. It said the contempt motion *had* presented a close case, "because as has been pointed out here, notwithstanding the Court's comments about Mr. Thomason and knowing him and so forth, the Court struggled in its decision in making facts which it thought were found—supported a finding of contempt. Difficult decision, alright." RP at 383. It explained that the attorney notes were

9

problematic because what happens then is that the Court—this Court's decision about well, was it contempt is thrown into question. In other words, was it contempt—or was it in an effort to try and secure a court order which could be used not today, and as Mr. Chase says, at this time there is no trust. Right now today, there isn't. Maybe tomorrow there is or next week or next month. And so, it calls into question then in my mind, well, was there a violation or was this an attempt at somehow gaining a sword which could be used within the terms of the trust to get rid of the Stenneses.

RP at 383-84. The court continued, "I don't know and I want to hear, I—the Court would want to hear then from this attorney, Mr. Speidel about what were these notes, what did they mean and what did he think that Mr. Thomason wanted." RP at 384.

The court concluded by saying it was vacating the order finding contempt and it directed the Stenneses' lawyer to prepare a "very simple order" based on CR 59(a)(4) and newly-found evidence. RP at 385. The order thereafter entered by the court stated in relevant part:

> 1.      The following Orders entered on June 20, 2019 are vacated: a) Order on Motions for Contempt and to Surrender Weapons; and b) Order Denying Motion for New Hearing.
> . . . .
> 3.      The Second Motion for New Hearing and for Reconsideration is granted with respect to the Motion for Contempt pursuant to CR 59(a)(4).
> . . . .
> 5.      Petitioners' request for fees . . . is denied without prejudice because the contempt matter has not yet been adjudicated.

CP at 519-20. The Thomasons moved for reconsideration, which was denied. They appeal.

ANALYSIS

I.     THE STENNESES INADEQUATELY BRIEF A THRESHOLD CHALLENGE TO THE APPEAL

In responding to the Thomasons' opening brief, the Stenneses raise a threshold

issue of whether the court's order granting a new hearing and reconsideration is properly

before us.[3]  Under RAP 7.3, we have the authority to determine whether a matter is

properly before us.  That very question was raised by this court when the Thomasons'

appeal was filed.  After hearing oral argument from the parties, our commissioner found

that it was not.  *See* Comm'r's Ruling, *Thomason v. Stennes*, No. 37037-2-III (Wash. Ct.

App. Nov. 5, 2019).  Our commissioner construed the trial court as having vacated its

June 20 order of contempt based on its failure to include the Stenneses' lawyer in the

presentment hearing.  While the trial court had orally granted the motion for contempt,

our commissioner concluded that no final order of contempt had been effectively entered.

*Id.* at 3.

The Thomasons filed a motion to modify the commissioner's decision.  *See* Mot.

to Modify Ruling, *Thomason v. Stennes*, No. 37037-2-III (Wash. Ct. App. Dec. 4, 2019).

A three-judge panel granted the motion, accepting the Thomasons' argument that the trial

court had granted a motion for a new trial, one of the few exceptions to RAP 2.2(a)(1)'s

requirement for a final judgment in order to appeal of right.  RAP 2.2(a)(9); *see* Order

---

[3] The Stenneses refer to review being "improvidently granted," but as the Thomasons point out, that is language we use when a matter is before us on discretionary review.

No. 37037-2-III
*Thomason v. Stennes*

Granting Mot. to Modify Comm'r's Ruling, *Thomason v. Stennes*, No. 37037-2-III

(Wash. Ct. App. Jan.7, 2019).

It is not clear that the commissioner was wrong and the panel was right; the trial

court's order is ambiguous. The trial court saw no difference between granting

reconsideration or a new trial. If it had recognized that ordering a new trial would be

appealable, it could have vacated its contempt order on due process grounds or granted

reconsideration, either of which would have resulted in an order that could not be

appealed. Nonetheless, as the Thomasons correctly point out, the Stenneses did not seek

discretionary review of denial of the motion to modify. They have provided no legal

authority or argument addressing our authority to revisit our now year-old decision that

the Thomasons could appeal of right. We will not review the argument further. *See* RAP

10.3(a)(2), (6).

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ORDERING A NEW HEARING
        UNDER CR 59(a)(4)

Turning to the appeal, we easily find no abuse of discretion by the trial court.

A new trial may be granted on the basis of newly discovered evidence if the

evidence (1) will probably change the result of the trial, (2) was discovered since the trial,

(3) could not have been discovered before trial by the exercise of due diligence, (4) is

material, and (5) is not merely cumulative or impeaching. *Holaday v. Merceri*, 49 Wn.

App. 321, 329, 742 P.2d 127 (1987) (quoting *State v. Evans*, 45 Wn. App. 611, 613, 726

12

P.2d 1009 (1986)). A trial court's order granting a motion for a new trial is reviewed for abuse of discretion. *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000); *Coffer v. Erickson*, 61 Wash. 559, 566-67, 112 P. 643 (1911). The question of whether new evidence warrants granting a new trial "is a question necessarily so largely in the discretion of the trial judge that it must appear with reasonable certainty that such discretion has been abused." *Id.*

When a party appeals the trial court's *grant* of a new trial, as opposed to a denial, a much stronger showing of abuse of discretion is generally required. *Berry v. Coleman Sys. Co.*, 23 Wn. App. 622, 624, 596 P.2d 1365 (1979). And since this was a bench trial, presenting no risk of usurping the function of the jury, it presents the context in which we are least likely to question the decision of the trial court. *Cf. State v. Williams*, 96 Wn.2d 215, 222, 634 P.2d 868 (1981) (where trial is to a jury, the trial court's discretion is not a license to weigh the evidence and substitute its judgment).

The Thomasons do not dispute that the evidence relied on by the Stenneses was discovered since the trial and could not have been discovered before trial by the exercise of due diligence. We address the three required showings that they do challenge.

*Likelihood of changing result*

When the judge is the factfinder, he or she is in a position to know whether the evidence would change the result in a new trial. *Garratt v. Dailey*, 46 Wn.2d 197, 204, 279 P.2d 1091 (1955). The Thomasons argue that the trial court never explicitly found

that the Stenneses' new evidence would probably change the result. Implicitly, however, it did. It was fully informed of the applicable law and granted the motion.[4] The Thomasons cite no legal authority that requires an explicit finding. And if the failure to make an explicit finding would be error, it was not preserved, since the Thomasons did not object to the lack of a finding in the trial court. *See* RAP 2.5(a).

The Thomasons next argue that the trial court was not in a good position to decide the likelihood of a changed outcome because it offered to recuse in announcing its ruling. We rely on trial courts to decide this issue not as soothsayers, however, but based on their "particularly advantageous" presence at the original trial. *Skov v. MacKenzie-Richardson, Inc.*, 48 Wn.2d 710, 713, 296 P.2d 521 (1956). This is a backward-looking analysis. The trial court cannot possibly predict how a retrial will unfold and CR 59(a)(4) is not reasonably read as requiring it to do so.

Finally, the Thomasons argue that the result could not change because the contemptuous acts found by the trial court were "admitted in part" by the Stenneses. Br. of Appellant at 38. The Stenneses did not admit that any of their actions violated the terms of the protective order, however.

---

[4] The trial court also said that the new evidence threw its finding of contempt into question.

*Materiality*

The new evidence relied on in seeking a new trial must be material to the issue of the case. *Stibbs v. Stibbs*, 37 Wn.2d 377, 379, 223 P.2d 841 (1950) (citing *Ulbright v. Hageman*, 181 Wash. 706, 708, 44 P.2d 196 (1935) (evidence must be "material to the issue involved")). "Material evidence" is defined as "[e]vidence having some logical connection with the facts of the case or the legal issues presented." BLACK'S LAW DICTIONARY 701 (11th ed. 2019). The Thomasons challenge the materiality of the evidence.

A major issue at the hearing on the motion for contempt was whether the Stenneses committed the violations of the protection order alleged by the Thomasons, or whether matters alleged by them were exaggerated or contrived with a view to establishing a basis under Bert's will to evict the Stenneses. The attorney notes were material to that issue.

*Merely cumulative or merely impeaching*

"'Cumulative evidence is additional evidence of the same kind to the same point.'" *Williams*, 96 Wn.2d at 223-24 (quoting *Roe v. Snyder*, 100 Wash. 311, 314, 170 P. 1027 (1918)). In *Roe*, newly discovered evidence of an extrajudicial admission by one of the parties was held to be evidence different in kind from the parties' conflicting evidence at trial. "It was evidence of an independent fact, not touched by any evidence at the trial, but bearing directly and vitally upon the main issue." *Snyder*, 100 Wash. at 315.

At the contempt hearing in this case, the Stenneses offered Bert's will and Mike's testimony about Mr. Thomason's keenness for the Stennes property as circumstantial evidence of a scheme to have the Stenneses evicted. They had no direct evidence. The newly discovered evidence of statements apparently made by Mr. Thomason and his Okanogan lawyer to Mr. Speidel or Mr. Bentsen was evidence of an independent fact— steps actually taken—that was not touched on by any evidence at the trial, but that bore directly and vitally on a critical issue. Assuming but not deciding that it can be characterized as cumulative evidence, it was clearly evidence of a different kind.

"'Impeachment evidence' refers to '[e]vidence used to undermine a witness's credibility.'" *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 46, 409 P.3d 214 (2018) (quoting BLACK'S LAW DICTIONARY 676 (10th ed. 2014)) (McCloud, J., dissenting).

> Impeachment evidence typically tests a witness's ability to perceive or recall matters, highlights defects in a witness's character, or underscores a bias that may lead the witness to distort his or her testimony, either consciously or unconsciously. ROGER PARK & TIM LININGER, THE NEW WIGMORE: A TREATISE ON EVIDENCE: IMPEACHMENT & REHABILITATION § 2.1, at 65 (2012).

*Id.* In general, evidence that is merely impeaching, without more, is insufficient to warrant a new trial. *See, e.g.*, *Donovick v. Anthony*, 60 Wn.2d 254, 258, 373 P.2d 488 (1962).

The attorney notes were impeaching, but they were not merely impeaching. Beyond challenging Mr. Thomason's credibility, they were direct evidence that the

16

Thomasons were knowingly taking steps that could lead to the Stenneses' eviction,

giving them a motive to exaggerate or contrive complaints about the Stenneses' conduct.

The trial court did not abuse its discretion in ordering a new hearing on the basis

of the Stenneses' newly discovered evidence.

Affirmed.[5]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Pennell, C.J.                                                      Korsmo, J.P.T.[6]

---

[5] The Thomasons request attorney fees pursuant to RAP 18.1 and RCW 7.21.030(3), but at this point, the Stenneses have not been found in contempt of court. We decline to address whether the attorney fees and costs the Thomasons incurred in this appeal will be recoverable losses under RCW 7.21.030(3) if the Stenneses are found in a new hearing to have been in contempt.

[6] Judge Kevin M. Korsmo was a member of the Court of Appeals at the time argument was held on this matter. He is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.